Dell was one of Intel's two largest customers. In order to improve its competitive position vis-à-vis other manufacturers of microprocessors/chips, especially its principal domestic competitor, AMD, Intel secretly paid very large, end-of-quarter cash rebates to PC OEMs that purchased all or virtually all of their microprocessor/chip requirements from Intel. These rebates, which were in fact kickbacks, were not traditional volume-based discounts. These monies were paid separate and apart from and in addition to certain publicly known, co-marketing funds which Intel made available to certain of its customers to assist in product advertising featuring the "Intel" name.

226.    While Intel and AMD have long been competitors, Intel long held the dominant position, controlling the lion's share of the PC microprocessor market. However, in 2001, AMD had gained share for five years straight. Its unit share hit 21.8%, but then suddenly fell to 9% in mid-2004, as Intel went into Japan and gave the Japanese computer makers millions of dollars in rebates for varying degrees of exclusivity – in some cases 100%. In 2002-2003, Intel stepped up its exclusivity rebate/kickback tactic worldwide when it saw itself falling behind AMD technologically, as AMD developed superior microprocessors/chips.

227.    Intel's ability to use its exclusivity rebates/kickbacks to control the purchasing decisions of the computer makers stemmed from the commoditization of the computer-making business, which drove prices lower and left most PC manufacturers with thin operating margins. Because of the computer manufacturers' narrow margins, Intel's payments of end-of-quarter rebates often determined whether the publicly owned PC manufacturers "hit" their quarterly numbers. These payments became the industry's "heroin," as AMD founder Jerry Sanders has put it. Because the payments were non-contractual, Intel could stop making them at any time.

228.    The secret rebate/kickback payments Intel provided customers in return for exclusive or near-exclusive dealings were of dubious legality and secrecy and deception of the public markets and regulators was key. To keep them secret, Intel did not disclose the nature or

existence of its exclusive-dealing payments to Dell in its SEC filings or other public disclosures. And Intel also insisted that its customers, like Dell, not publicly disclose the existence of these rebate/kickback payments in their communications with securities markets or their SEC filings. This not only made Intel's SEC filings deceptive and false, it also contributed to the scheme by keeping this information from analysts that followed Dell and evaluated its business model and profitability. Intel monitored and reviewed Dell's SEC filings to make sure Dell was not disclosing the rebate scheme. This secrecy was required because Intel feared that if these payments became known, antitrust officials in various countries would likely take legal action against Intel. Intel customers, like Dell, who accepted these cash rebate payments from Intel became very dependent upon these payments, which were made by Intel in cash at or near the end of the customer's quarter, as they had a direct, material and positive impact on the reported operating profits and profit margins of the company receiving the rebate/kickback. Dell did not want the nature or extent of the Intel payments to become known as, due to their dubious legality and uncertainty, analysts would discount their value to Dell and Dell's operating profitability and margins would not be perceived to be nearly as strong as they were – which would hurt Dell's stock price. Therefore, Intel and Dell agreed that in return for receiving these large quarter-end payments, Dell would not disclose the existence or amount of the payments Dell was receiving relating to the Intel exclusive-dealing rebate/kickback scheme.

229. Intel knew that the existence and amount of the payments Dell was receiving from it pursuant to the exclusive-dealing rebate/kickback payment scheme were material to Dell's reported financial results, especially its operating profit margins, that Dell was not disclosing this information and that, as a result, Dell's SEC filings, financial statements and other communications with the securities markets were false and misleading. Intel is sued in this action for a violation of §10(b) and Rule 10b-5(a)-(c) for participation in a scheme to defraud

and course of business that operated as a fraud or deceit on the purchasers of Dell's publicly

traded securities during the Class Period.

230.    During the first half of 3/05, information became public that Intel was violating

the antitrust laws by paying huge kickbacks to customers (computer manufacturers) to get them

to buy microprocessor chips only from Intel.  For instance:

(a)    On 3/4/05, Japanese regulators had determined that Intel was violating

Japan's antitrust laws by paying secret rebates, *i.e.*, kickbacks, to Japanese computer

manufacturers in return for their purchasing microprocessors exclusively from Intel.  A report

stated:

> Japan's Fair Trade Commission will rule against a local unit of the
> world's leading microchip maker Intel Corp. over suspected violation of anti-
> monopoly laws, a report said Friday.
>
> Intel has been under investigation on allegations that it pressured
> its customers to limit their procurement from rival firms in exchange for discounts
> on Intel products.

(b)    On 3/7/05, the *San Jose Mercury News* reported on the Japanese antitrust

proceeding against Intel:

**Japan reportedly accuses Intel of antitrust violations**

> Japanese newspapers are reporting Japan's government has found Intel in
> violation of the country's antitrust laws.
>
> *               *               *
>
> Yomiuri Shimbun reported that the agency found Intel offered discounts
> on is microprocessors to computer makers in Japan provided they agreed to limit
> purchases of chips from competing manufacturers.

(c)    On 3/8/05, it was reported that the JFTC had ordered Intel to cease and

desist conduct which violated Section 3 of the Antimonopoly Act (Private Monopolization).

According to the JFTC, *since 5/02, Intel had paid the five major Japanese computer OEMs*

*rebates and/or certain funds referred to as "MDF" (Market Development Funds) on the*

*condition that the Japanese OEMs purchase 100% of their microprocessors from Intel and refrain from adopting competitors' microprocessors.* From these reports, it appeared that Intel did not contest the charges of the JFTC and that Intel's illegal kickback payments to its customers in Japan would cease.

231.     AMD's 6/05 complaint against Intel laying out the rebate scheme in detail, was not filed until the Japanese authorities went after Intel for this illegal scheme and until after AMD's lawyers concluded months' worth of interviews with persons with first-hand knowledge. AMD's lawyers then assembled the highlights into a 48-page complaint which AMD filed in federal court. The complaint challenged Intel's alleged misconduct not just with five Japanese computer makers, but also with more than 30 other industry participants around the world – including Dell. "It's an Academy Award-winning complaint," commented a private antitrust lawyer who is a former FTC policy director. Within weeks of the filing, EC competition regulators raided Intel's offices in England, Germany, Italy and Spain. In 2/06, South Korean regulators raided Intel's offices in Seoul and it has been publicly reported that European Union investigators have recommended that the European Antitrust Commission formally charge Intel with illegally thwarting any competition in the computer chip market due to the "exclusivity" discounts provided PC manufacturers, including Dell.

232.     Key to the AMD complaint and the Intel rebate/kickback scheme are allegations of the "first dollar rebates" Intel offered. The rebates worked like this. Suppose XYZ computer maker needs 100 chips per quarter, and that during the last quarter it bought 90 from Intel and 10 from AMD. Since AMD wants to grow, it might bid for 20 of XYZ's 100 units in the new quarter. Intel tells XYZ that its price per processor is, say $90, but that if XYZ ends up buying more than 80% of its processors from Intel that quarter, it will pay a rebate of $10 per processor, resulting in an $80 price. The rebate, however, applies not just to the processors that put XYZ

over the 80% target, but to every Intel processor XYZ purchases that quarter, back to the first one. This resulted in a large, subjective, non-contractual payment to Dell which boosted its reported operating margins, making the Company's operations and its business model look more profitable and effective and efficient than they really were.

## DELL'S MISLEADING FINANCIAL STATEMENTS
## AND DISCLOSURES

233. Dell's financial statements and related disclosures during the Class Period were materially false and misleading due to the Company's failure to properly and promptly accrue losses for warranty costs associated with its defective OptiPlex™ products. Dell also failed to disclose that an important component of its gross profit and operating income was a quarterly rebate it received from Intel for Dell purchasing a certain percentage of its chips from Intel. The rebate was at Intel's discretion, was possibly illegal, was material to Dell's financial statements and was not guaranteed to Dell. Yet contrary to accounting and SEC rules, Dell failed to disclose this key aspect of its earnings. These practices made Dell's reported operating results not indicative of the true nature of Dell's underlying business nor of the business trends investors could expect based on those results. Dell's failure to take charges to reflect the warranty obligation it had and to disclose the Intel rebates was a violation of GAAP and SEC rules.

234. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite note or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

235.    Dell has now acknowledged that the SEC and U.S. Attorney are conducting investigations of the Company's past financial statements, involving "accruals, reserves and other balance sheet items." This is indicative of the type of manipulations Dell has engaged in related to warranty accruals and concealing the rebates from Intel if it is not related directly to these items. The subpoenas relate to Dell's financial statements since 2002, *i.e.*, prior to and through the entire Class Period.

236.    Dell's reported financial results for F02-F07 are set forth below:

### DELL COMPUTER CORPORATION

Quarterly & Annual Financial Results
(in Millions, except EPS)

| | Fiscal 2002 | | | | |
|---|---|---|---|---|---|
| | 5/4/01 | 8/3/01 | 11/2/01 | 2/1/02 | Year |
| Net Revenue | $8,028 | $7,611 | $7,468 | $8,061 | $31,168 |
| Gross Profit | $1,448 | $1,330 | $1,313 | $1,416 | $5,507 |
| Gross Margin | 18.0% | 17.5% | 17.6% | 17.6% | 17.7% |
| Operating Income | $588 | $545 | $544 | $594 | $2,271 |
| Oper/Exp/Revenue | 10.7% | 10.3% | 10.3% | 10.2% | 10.4% |
| Operating Margin | 7.3% | 7.2% | 7.3% | 7.4% | 7.3% |
| Net Income | $462 | $433 | $429 | $456 | $1,780 |
| Diluted EPS | 0.17 | $0.16 | $0.16 | $0.17 | $0.65 |
| | | (1) | | | (1) |

| | Fiscal 2003 | | | | |
|---|---|---|---|---|---|
| | 5/3/02 | 8/2/02 | 11/1/02 | 1/31/03 | Year |
| Net Revenue | $8,066 | $8,459 | $9,144 | $9,735 | $35,404 |
| Gross Profit | $1,391 | $1,515 | $1,662 | $1,781 | $6,349 |
| Gross Margin | 17.2% | 17.9% | 18.2% | 18.3% | 17.9% |
| Operating Income | $590 | $677 | $758 | $819 | $2,844 |
| Oper/Exp/Revenue | 9.9% | 9.9% | 9.9% | 9.9% | 9.9% |
| Operating Margin | 7.3% | 8.0% | 8.3% | 8.4% | 8.0% |
| Net Income | $457 | $501 | $561 | $603 | $2,122 |
| Diluted EPS | $0.17 | $0.19 | $0.21 | $0.23 | $0.80 |

| | Fiscal 2004 | | | | |
|---|---|---|---|---|---|
| | 5/2/03 | 8/1/03 | 10/31/03 | 1/30/04 | Year |
| Net Revenue | $9,532 | $9,778 | $10,622 | $11,512 | $41,444 |
| Gross Profit | $1,748 | $1,778 | $1,935 | $2,091 | $7,552 |
| Gross Margin | 18.3% | 18.2% | 18.2% | 18.2% | 18.2% |
| Operating Income | $811 | $840 | $912 | $981 | $3,544 |

| | | | | | |
|---|---|---|---|---|---|
| Oper/Exp/Revenue | 9.8% | 9.6% | 9.6% | 9.6% | 9.7% |
| Operating Margin | 8.5% | 8.6% | 8.6% | 8.5% | 8.6% |
| Net Income | $598 | $621 | $677 | $749 | $2,645 |
| Diluted EPS | $0.23 | $0.24 | $0.26 | $0.29 | $1.01 |

| | | | Fiscal 2005 | | |
|---|---|---|---|---|---|
| | 4/30/04 | 7/30/04 | 10/29/04 | 1/28/05 | Year |
| Net Revenue | $11,540 | $11,706 | $12,502 | $13,457 | $49,205 |
| Gross Profit | $2,073 | $2,134 | $2,313 | $2,495 | $9,015 |
| Gross Margin | 18.0% | 18.2% | 18.5% | 18.5% | 18.3% |
| Operating Income | $966 | $1,006 | $1,095 | $1,187 | $4,254 |
| Oper/Exp/Revenue | 9.6% | 9.6% | 9.7% | 9.7% | 9.7% |
| Operating Margin | 8.4% | 8.6% | 8.8% | 8.8% | 8.6% |
| Net Income | $731 | $799 | $846 | $667 | $3,043 |
| Diluted EPS | $0.28 | $0.31 | $0.33 | $0.26 | $1.18 |

| | | | Fiscal 2006 | | |
|---|---|---|---|---|---|
| | 4/29/05 | 7/29/05 | 10/28/05 | 2/3/06 | Year |
| Net Revenue | $13,386 | $13,428 | $13,911 | $15,183 | $55,908 |
| Gross Profit | $2,491 | $2,499 | $2,251 | $2,709 | $9,950 |
| Gross Margin | 18.6% | 18.6% | 16.2% | 17.8% | 17.8% |
| Operating Income | $1,174 | $1,173 | $754 | $1,246 | $4,347 |
| Oper/Exp/Revenue | 9.8% | 9.9% | 10.8% | 9.6% | 10.0% |
| Operating Margin | 8.8% | 8.7% | 5.4% | 8.2% | 7.8% |
| Net Income | $934 | $1,020 | $606 | $1,012 | $3,572 |
| Diluted EPS | $0.37 | $0.41 | $0.25 | $0.43 | $1.46 |
| | | | (2) | | (2) |

| | | Fiscal 2007 | |
|---|---|---|---|
| | 5/5/06 | 8/4/06 | |
| Net Revenue | $14,216 | $14,094 | |
| Gross Profit | $2,472 | $2,190 | |
| Gross Margin | 17.4% | 15.5% | |
| Operating Income | $949 | $605 | |
| Oper/Exp/Revenue | 10.7% | 11.2% | |
| Operating Margin | 6.7% | 4.3% | |
| Net Income | $762 | $502 | |
| Diluted EPS | $0.33 | $0.22 | |
| | (3) | (3) | |

(1)  Excluding special charges

(2)  Includes project charges in Cost of Revenue of $338 million for servicing certain OptiPlex systems from a vendor part that failed, plus $104 million in SG&A Expenses for workforce realignment expenses.

(3)  Includes $77 million and $81 million in stock based compensation expenses, for the 1stQ and 2ndQ F07, respectively.

**Dell's Failure to Properly Account for Warranty Liabilities**

237.   GAAP, as set forth in FASB Statement of Concepts ("Concepts") No. 5, requires

that an entity record a loss when it becomes apparent that an asset has been impaired.  *See*

Concepts No. 5, ¶87.  According to GAAP, as set forth in Statement of Financial Accounting

Standard ("SFAS") No. 5, *Accounting for Contingencies*, an entity shall record a loss

contingency when information available prior to the issuance of the financial statements

indicates (a) it is probable an asset is impaired or a liability has occurred, and (b) the amount of

loss can be reasonably estimated.  See SFAS No. 5, ¶8.

238.   A significant contingency under both GAAP (as per SFAS No. 5) and for Dell's

business was obligations related to product warranties and product defects.  SFAS No. 5, ¶4b.

One of Dell's critical accounting policies was warranty accruals.  The 2004 Form 10-K stated in

part: "Dell believes its most critical accounting policies relate to revenue recognition, warranty

accruals, and income taxes."

239.   Dell represented the following with respect to its accruals for warranty liabilities,

indicating that its estimates were "relatively predictable" and that it adjusted its accrual each

quarter:

> *Warranty* – Dell records warranty liabilities at the time of sale for the
> estimated costs that may be incurred under its basic limited warranty. The specific
> warranty terms and conditions vary depending upon the product sold and country
> in which Dell does business, but generally includes technical support, repair parts,
> labor, and a period ranging from 90 days to three years.  Factors that affect Dell's
> warranty liability include the number of installed units currently under warranty,
> historical and anticipated rates of warranty claims on those units, and cost per
> claim to satisfy Dell's warranty obligation.   The anticipated rate of warranty
> claims is the primary factor impacting Dell's estimated warranty obligation. The
> other factors are relatively insignificant because the average remaining aggregate
> warranty period of the covered installed base is approximately 20 months, repair
> parts are generally already in stock or available at pre-determined prices, and
> labor rates are generally arranged at pre-established amounts with service
> providers.   Warranty claims are relatively predictable based on historical
> experience of failure rates. Each quarter, Dell reevaluates its estimates to assess

the adequacy of its recorded warranty liabilities and adjusts the amounts as necessary.

240.    In fact, Dell did not adequately accrue warranty liabilities, specifically for its OptiPlex™ products, which later led to a $307 million charge to account for significant unaccrued for liabilities for this product.

**OptiPlex™ Products**

241.    Dell's warranty obligations during the Class Period for the OptiPlex™ products were a significant issue.  For business systems, including OptiPlex™, Dell offered a standard three-year warranty with on-site service, increasing the likelihood it would incur significant costs.  The OptiPlex GX270 systems in question (both the GX270 and GX280 desktops were later disclosed to have the problem with the motherboard) were introduced in 5/03, with Dell representing that the systems, which came with "a three-year next-business-day onsite service," are

> designed for networked business environments, with long product lifecycles, standards-based technology and a full suite of user-friendly management tools, making them easy to deploy and maintain.

242.    In the same press release on 5/21/03, Dell said the following about the systems:

> Also new to the OptiPlex line is the availability of Serial ATA disk drives, which offer faster data transfer rates than Parallel ATA drives and employ smaller cables, improving airflow within the chassis.

> "These two new systems provide more balance between performance and being able to set more aggressive goals for reductions in power consumption," said Tim Mattox, vice president of Client Product Marketing for Dell.  "These two products offer stability, strong management features and outstanding price/performance for enterprise customers."

> The GX270 and SX270 qualified for the ENERGY STAR(R) designation due in large part to its support of S3 "sleep state," which suspends a user's session to RAM after a preset time and consumes less than 15 watts of power while activated. When these systems are S3-enabled, they can help customers reduce energy costs by up to $175 per system over 3 years when compared to the same systems operated in screen saver mode. If all of Dell's U.S. GX270 and SX270 customers operated in S3 mode for one year, enough energy could be saved to power an estimated 90,000 homes.

243.    The combination of Dell's representations about the stability and performance of

the OptiPlex products with its three-year standard warranty increased the likelihood that if there

were any problems at all with the systems that customers would be both disappointed with the

product and both likely and entitled to require Dell to fix the problems.

244.    GAAP, as set forth in SFAS No. 5, ¶¶24-25, states the following with respect to

warranties:

> 24.    A warranty is an obligation incurred in connection with the sale of
> goods or services that may require further performance by the seller after the sale
> has taken place. . . .  Losses from warranty obligations shall be accrued when the
> conditions in paragraph 8 are met.  Those conditions may be considered in
> relation to individual sales with warranties or in relation to groups of similar types
> of sales made with warranties.  If the conditions are met, accrual shall be made
> even though the particular parties that will make claims under warranties may not
> be identifiable.

> 25.    If, based on available information, it is probable that customers
> will make claims under warranties relating to goods or services that have been
> sold, the condition in paragraph 8(a) is met at the date of an enterprise's financial
> statements because it is probable that a liability has been incurred.  Satisfaction of
> the condition in paragraph 8(b) will normally depend on the experience of an
> enterprise or other information.

245.    In fact, the motherboards in the OptiPlex GX270 and GX280 business desktop

computers had capacitors which bulged and failed and would cause the PCs not to boot.  The

system boards in question were manufactured from 4/03 to 3/04. At issue were faulty capacitors

on motherboards that store power and regulate voltage. Defective capacitors found in the Dell

OptiPlex workstations and PCs with the Intel D865GBF motherboard have been found to bulge,

pop, leak and crust over, causing video failure and periodic system shutdowns. The solution to

this problem was to replace the motherboard – a time-consuming process.  The capacitors are

relatively inexpensive but replacing the whole motherboard on numerous PCs was very

expensive.  Thus, if there were any problems with the product, the likelihood of claims was high

and the cost of correcting the problem was significant – both factors that should have increased

Dell's accruals for this contingency.

246.    Dell knew long before the 3rdQ F05 that it had problems with the OptiPlex

GX270 and GX280. In 11/04, Dell China confirmed problems with the GX280 PC. Computer

repair shops noticed frequent "blue screens of death" and various programs that crashed on the

systems in 1/05. By 2/05, Dell was replacing all the motherboards with no questions asked.

247.    Belatedly, in the 3rdQ F05, Dell recorded a $307 million charge to reflect the

costs to service OptiPlex™ systems, including a vendor part that failed to perform to

specification. This was a huge charge, reducing Dell's gross profit in the quarter ended 10/28/05

to 16.18%, from its reported rate in most quarters of the Class Period of 17.8% to 18.5%. Note

the following chart which shows Dell's gross margin, including the OptiPlex write-off and the

most recent quarter where gross margin fell to 15.54% due to the elimination of the rebates from

Intel, described below, and due to Dell having to cut prices dramatically to make up for lost sales

due to service and product problems:



Dell, Inc - Gross Margin

248.   Had Dell properly accrued for warranty expenses it knew it would incur for the OptiPlex™ problems in a timely fashion, its gross margin and earnings in the last part of 2004 and first half of 2005 would have been materially lower than the amounts Dell reported.

249.   That Dell was understating its reserve for warranty costs is demonstrated by the relationship of actual cash warranty costs to the warranty reserve. In 1stQ F04, the warranty cost as a percentage of warranty reserve was about 30% (comparable to Hewlett-Packard and just above EMC). However, by end of F04 and early F05, the ratio increased to above 40% and has stayed there since. At the same time, Hewlett-Packard's and EMC's respective ratios have declined. This is an indication that Dell was under-reserving for warranty costs. These increasing costs also indicate deteriorating product quality. The decreasing reserve came in the face of Dell switching its basic warranty on consumer PCs from 90 days to one year in mid F05, which would increase the liability.

250.   Dell was also required to recognize extended warranty revenue over the term of the warranty. FASB Technical Bulletin ("FTB") No. 90-1, *Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts*, states in part:

> Like short-duration insurance contracts, extended warranty and product maintenance contracts provide coverage against the risk of certain specified claim costs for a specified period. Those claim costs may take the form of repair costs if the product requires repair or service costs if the customer requests that a covered service be performed on the product. Paragraph 13 of Statement 60 indicates that premiums from short-duration insurance contracts should be recognized as revenue over the period of the contract in proportion to the amount of insurance protection provided. This Technical Bulletin concludes that revenue on extended warranty and product maintenance contracts also should be recognized in income evenly over the contract period except for those circumstances in which sufficient historical evidence indicates that costs of providing services under the contract are incurred in some pattern other than straight line.

FTB 90-1, ¶9.

251.    Dell represented that it did so. In its F06 Form 10-K, Dell stated:

Revenue from extended warranty and service contracts, for which Dell is obligated to perform, is recorded as deferred revenue and subsequently recognized over the term of the contract or when the service is completed.

252.    Because Dell combined the accounting for basic and extended warranties in one number, it obscured the under-accrual of warranty costs and the over-recognition of warranty income from the sale of extended warranties.  Both manipulations caused Dell's income to be overstated.

**Dell Failed to Make Required Disclosures About the Existence, Impact and Uncertainty of Intel Rebates**

253.    It has now been documented extensively that over the past several years, in an effort to maintain its market share, Intel has paid rebates to computer manufacturers on a retroactive basis.  Note how *Fortune* explained the rebates:

Suppose XYZ computer maker needs 100 chips per quarter, and that during the last quarter it bought 90 from Intel and ten from AMD.  Since AMD wants to grow, it might bid for 20 of XYZ's 100 units in the new quarter. . . .

Here's how Intel allegedly dashes AMD's hopes for gradual growth.  It tells XYZ that its price per processor is, say, $90, but that if XYZ ends up buying more than 80% of its processors from Intel that quarter, it will pay a rebate of $10 per processor, resulting in an $80 price.  The rebate, however, applies not just to the processors that put XYZ over the 80% target, but to *every Intel processor XYZ purchases that quarter, back to the first one*.  That offer knocks AMD out of the box.    [AMD] [o]utside counsel [Charles] Diamond explains why: "Effectively, what Intel's saying is, If you don't buy those ten incremental units from AMD, we'll give you them for free."  That's because 80 processors at $90 each cost the same as 90 processors at $80 each."

(Emphasis in original.)

254.    As either the top seller of personal computers (or close to it at all times during the Class Period), Dell was a top recipient of Intel's rebates.  These rebates were significant to Dell's reported financial results.  Even much smaller computer makers received significant rebates, with Toshiba, for example, receiving $100 million per year.  Dell's rebates, given its size, were approximately $1 billion per year.  These rebates (internally called "e-CAP dollars") were the

equivalent to more than 2% points of gross margin or 10% of gross profit. Given Dell's tax rate

for financial reporting purposes, the rebate added approximately 20% to net income and EPS

each quarter as well.

255.    Given the significance of the rebates to Dell's reported financial results, the

rebates were required by GAAP and SEC rules to be disclosed. Internally at Dell these rebates

were significant enough to merit a separate line item on certain internal Company reports. This

significance was even more the case given the rebates' uncertain future. The rebates were:

(a)    not guaranteed – Intel could stop them at any time or could reduce them

significantly without recourse by Dell;

(b)    potentially illegal in that they could be stopped at any time by third

parties; and

(c)    informal such that Dell would not be able to predict the amount and timing

and duration of the rebates.

256.    Given the importance and uncertainty of the rebate practice, investors were denied

a full picture of Dell's financial statements and the predictive value of the financial statements by

Dell's concealment of the rebates. In fact, other vendors who received the rebates described (at

least at a cursory level) the rebates and the risk that the rebates could be eliminated. For

instance, Ingram Micro described the rebates as follows:

> We receive purchase discounts and rebates from suppliers based on various
> factors, including sales or purchase volume and breadth of customers. These
> purchase discounts and rebates may affect gross margins. Many purchase
> discounts from suppliers are based on percentage increases in sales of products.
> Our operating results could be negatively impacted if these rebates or discounts
> are reduced or eliminated or if our vendors significantly increase the complexity
> of process and costs for us to receive such rebates.

Dell omitted any similar explanation from its filings.

257.   The SEC requires that, as to annual and interim financial statements filed with the SEC, registrants include a management's discussion and analysis section which provides information with respect to the results of operations and "also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." *See* Regulation S-K, 17 C.F.R. §229.303(a).   Regulation S-K states that, as to annual results, the management's discussion and analysis section shall:

> (3)   Results of operations.  (i)   Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii)   Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §229.303(a)(3)(i)-(ii).

258.   The SEC also requires that interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations so as to enable the reader to assess material changes in financial condition and results of operations. Regulation S-K, 17 C.F.R. §229.303(b), states that: "The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set forth above], except that the impact of inflation and changing prices on operations for interim periods need not be addressed." As one court noted:

> Item 303 (a)(3)(ii) essentially says to a registrant:  If there has been an important change in your company's business or environment that significantly or

- 203 -

> materially decreases the predictive value of your reported results, explain this
> change in the prospectus. The obvious focus is on preventing the latest reported
> results from misleading potential investors, thereby promoting a more accurate
> picture of the registrant's future prospects.

See *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir.2002).

259. During the Class Period, Dell failed to truthfully disclose the impact of Intel's

rebates on its operating income and margins and that such rebates were discretionary by Intel and

could be eliminated at any time. After Dell announced its disastrous 2ndQ F07 results, Rollins

refused to comment on the Intel subsidies, but analysts understood cut-off of these subsidies to

be a "large chunk of the margin miss." *See* Merrill Lynch report dated 8/18/06. Yet Dell had

concealed in its prior SEC filings the significance of the Intel subsidies.

260. Moreover, GAAP requires that financial information be useful to potential

investors and creditors. GAAP, as described by Concepts No. 1, ¶37, states:

> Financial reporting should provide information to help present and potential
> investors and creditors and other users in assessing the amounts, timing, and
> uncertainty of prospective cash receipts from dividends or interest and the
> proceeds from the sale, redemption, or maturity of securities or loans . . . . Thus,
> financial reporting should provide information to help investors, creditors, and
> others assess the amounts, timing, and uncertainty of prospective net cash inflows
> to the related enterprise.

261. The rebates Intel paid to Dell were exactly the type of information that was

important to investors in assessing cash inflows to Dell. However, defendants omitted this

information from Dell's disclosures. In fact, while including risk disclosures about its

relationship with Intel as a significant supplier, it failed to disclose this material part of the

relationship. The disclosures about Intel, including for example these from Dell's Form 10-Ks,

omitted the rebate issue:

- F05 Form 10-K: "Dell currently relies on Intel Corporation as a sole source
  supplier of processors and Microsoft Corporation as a sole source for various
  operating system and application software products. These relationships and
  dependencies have not caused material disruptions in the past, and Dell believes

that any disruptions that may occur would not disproportionately disadvantage Dell relative to its competitors."

- F04 Form 10-K: "Dell's reliance on suppliers creates risks and uncertainties. Dell's manufacturing process requires a high volume of quality components that are procured from third-party suppliers. Reliance on suppliers, as well as industry supply conditions, generally involves several risks, including the possibility of defective parts (which can adversely affect the reliability and reputation of Dell's products), a shortage of components and reduced control over delivery schedules (which can adversely affect Dell's manufacturing efficiencies), and increases in component costs (which can adversely affect Dell's profitability)."

262. None of these disclosures even hinted at the possibility that Dell was receiving rebates that were materially improving Dell's reported financial results.  As a result, investors were left with a misleading portrayal of Dell's financial performance.  The impact of the market becoming aware of these rebates was significant.  As the issue came to the forefront beginning in the spring of 2006, analysts' forecasts for Dell's future gross margins dropped dramatically. Note the following chart showing Merrill Lynch's forecasts for Dell's F07 and F08 gross margin:



- 205 -

**The SEC and DOJ Investigations into Dell's Accounting
May Lead to a Restatement of Dell's Past Financial Statements –
an Admission that Those Financial Statements Were False**

263.    Dell has now acknowledged that the SEC and U.S. Attorney are investigating its

past financial statements.  On 9/11/06, Dell filed a Form 8-K:

> Dell Inc. announced today that it is delaying the filing of the Form 10-Q for its
> fiscal second quarter ended August 4, 2006.
>
> The company said it is unable to file because of questions raised in
> connection with the previously announced informal investigation by the U.S.
> Securities and Exchange Commission (SEC) into certain accounting and financial
> reporting matters and the subsequently initiated independent investigation by the
> Audit Committee of its board of directors. The company said it plans to file the
> report as soon as possible.
>
> The investigations have indicated the possibility of misstatements in prior
> period financial reports, including issues relating to accruals, reserves and other
> balance sheet items that may affect the company's previously reported financial
> results. The company is working with the Audit Committee and with the
> company's independent auditors to determine if any restatements of prior period
> financial reports will be necessary. "We have not yet reached any conclusion on
> materiality as to these issues," said Don Carty, chairman of the Audit Committee
> reviewing the matter.  "We are continuing to investigate the matter fully," Carty
> added.
>
> The SEC requests for information have been joined by a similar request
> from the United States Attorney for the Southern District of New York, who has
> subpoenaed documents related to the company's financial reporting from 2002 to
> the present.

264.    The fact that Dell has mentioned "restatement" of its past financial statements is

significant. The restatement of its financial statements would be an admission that:

(a)     The financial results originally issued during the Class Period and  public

statements regarding those results were materially false and misleading;

(b)     The financial statements reported during the Class Period were incorrect

based on information available to defendants at the time the results were originally reported; and

(c)     The financial statements should no longer be relied upon as being

accurate.

- 206 -

265.   The SEC has reiterated its position regarding restatements:

[T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia*, **to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter** . . . .

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as Amicus Curiae Regarding Defendants' Motions In Limine to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Jan. 31, 2002).

266.   The fact that Dell may restate its past financial statements would be an admission that the financial statements originally issued were false and that the overstatement of net income was material.   Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement anticipated for Dell would be to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13.  Moreover, SFAS No. 154, ¶25, *Accounting Changes and Error Corrections*" states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements."   Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements.  Dell's restatement would be due to error.

267.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider

responsibilities for accountability to prospective investors and to the public in general (Concepts No. 1, ¶50);

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts No. 1, ¶42);

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts No. 2, ¶¶58-59);

(d)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (Concepts No. 2, ¶79); and

(e)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts No. 2, ¶¶95, 97).

268.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DELL'S FALSE SARBANES-OXLEY
## CERTIFICATIONS IN ITS SEC FILINGS

269.    Throughout the Class Period, Dell's SEC 10-K and 10-Q filings contained

Sarbanes-Oxley certifications.  The language of these certifications were identical – with only

the signatures and filing date changed.  The 10-Q certifications stated:

**Controls and Procedures**

Under the supervision and with the participation of Dell's management,
including Dell's Chief Executive Officer and Chief Financial Officer, Dell has
evaluated the effectiveness of the design and operation of its disclosure controls
and procedures (as defined in Rule 13a-14(c) under the Securities Exchange Act
of 1934) within 90 days prior to the date of this report.  Based on that evaluation,
the Chief Executive Officer and Chief Financial Officer have concluded that these
disclosure controls and procedures are effective in enabling Dell to record,
process, summarize and report information required to be included in Dell's
periodic SEC filings within the required time period.  Additionally, there have
been no significant changes in Dell's internal controls or in other factors that
could significantly affect internal controls subsequent to the date that Dell
completed its evaluation.

CERTIFICATION OF MICHAEL S. DELL, CHAIRMAN OF THE BOARD
AND CHIEF EXECUTIVE OFFICER, PURSUANT TO RULE 13a-14
OF THE SECURITIES EXCHANGE ACT OF 1934

I, [Michael S. Dell or Kevin Rollins], certify that:

1.      I have reviewed this quarterly [or annual] report on Form 10-Q [or 10-K]
of Dell Computer Corporation;

2.      Based on my knowledge, this quarterly [or annual] report does not contain
any untrue statement of a material fact or omit to state a material fact in order to
make the statements made, in light of the circumstances under which such
statements were made, not misleading with respect to the period covered by this
quarterly [or annual] report;

3.      Based on my knowledge, the financial statements, and other financial
information included in this quarterly [or annual] report, fairly present in all
material respects the financial condition, results of operations and cash flows of
the registrant as of, and for, the periods presented in this quarterly [or annual]
report;

4.      The registrant's other certifying officers and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined in
Exchange Act Rule 13a-14 and 15c-14) for the registrant and we have:

a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly [or annual] report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly [or annual] report (the "Evaluation Date"); and

c) presented in this quarterly [or annual] report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of this Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function);

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this quarterly [or annual] report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

[Date]                                        [Signed – Chairman/CEO]

### CERTIFICATION OF JAMES M. SCHNEIDER, SENIOR VICE PRESIDENT AND CHIEF FINANCIAL OFFICER, PURSUANT TO RULE 13a-14 OF THE SECURITIES EXCHANGE ACT OF 1934

I, James M. Schneider, certify that:

1. I have reviewed this quarterly [or annual] report on Form 10-Q [or 10-K] of Dell Computer Corporation;

2. Based on my knowledge, this quarterly [or annual] report does not contain any untrue statement of a material fact or omit to state a material fact in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly [or annual] report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly [or annual] report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly [or annual] report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rule 13a-14 and 15d-14) for the registrant and we have:

a)     designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly [or annual] report is being prepared;

b)     evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly [or annual] report (the "Evaluation Date"); and

c)     presented in this quarterly [or annual] report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of this Evaluation Date;

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function);

a)     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)     .  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.     The registrant's other certifying officers and I have indicated in this quarterly [or annual] report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

[Date]                                              [Signed – CFO]

CERTIFICATION OF . . . AND CHIEF EXECUTIVE
OFFICER, AND JAMES M. SCHNEIDER, SENIOR VICE
PRESIDENT AND CHIEF FINANCIAL OFFICER, PURSUANT
TO 18 U.S.C. SECTION 1350, AS ADOPTED PURSUANT
TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, [Michael S. Dell or Kevin Rollins], Chief Executive Officer of Dell
Computer Corporation (the "Company"), hereby certify that (a) the Company's
Quarterly [or Annual] Report on Form 10-Q [or 10-K] for the quarter [or year]
ended [date], as filed with the Securities and Exchange Commission (the
"Report"), fully complies with the requirements of Section 13(a) of the Securities
Exchange Act of 1934, and (b) information contained in the Report fairly
presents, in all material respects, the financial condition and results of operations
of the Company.

[Date]                                    [Signed – Chairman/CEO]

I, James M. Schneider, Senior Vice President and Chief Financial Officer
of Dell Computer Corporation (the "Company"), hereby certify that (a) the
Company's Quarterly [or Annual] Report on Form 10-Q [or 10-K] for the quarter
[or year] ended [date], as filed with the Securities and Exchange Commission (the
"Report"), fully complies with the requirements of Section 13(a) of the Securities
Exchange Act of 1934, and (b) information contained in the Report fairly
presents, in all material respects, the financial condition and results of operations
of the Company.

[Date]                                    [Signed – CFO]

270.    The Form 10-K certifications also stated:

•     2004:

The management of Dell, with the participation of Dell's Chief Executive
Officer and Chief Financial Officer, has evaluated the effectiveness of Dell's
disclosure controls and procedures (as defined in Rule 13a-15(e) under the
Securities Exchange Act of 1934) as of the end of the period covered by this
Report.   Based on that evaluation, the Chief Executive Officer and Chief
Financial Officer have concluded that Dell's disclosure controls and procedures
are effective in enabling Dell to record, process, summarize, and report
information required to be included in Dell's periodic SEC filings within the
required time period.

In addition, the management of Dell, with the participation of Dell's Chief
Executive Officer and Chief Financial Officer, has evaluated whether any change
in Dell's internal control over financial reporting (as defined in Rule 13a-15(f)
under the Securities Exchange Act of 1934) occurred during Dell's fourth fiscal
quarter.   Based on that evaluation, Dell's Chief Executive Officer and Chief
Financial Officer have concluded that there has been no change in Dell's internal
control over financial reporting during the fourth fiscal quarter that has materially

affected, or is reasonably likely to materially affect, Dell's internal control over financial reporting.

- 2005:

*Evaluation of Disclosure Controls and Procedures* – Dell's Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of Dell's disclosure controls and procedures (as defined in Rule 13a-15(e) or 15d-15(e) under the Exchange Act) as of the end of the period covered by this report, have concluded that, based on the evaluation of these controls and procedures, Dell's disclosure controls and procedures were effective.

*Management's Report on Internal Control Over Financial Reporting* – Dell's management, under the supervision of Dell's Chief Executive Officer and Chief Financial Officer, is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act). Management evaluated the effectiveness of Dell's internal control over financial reporting based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on that evaluation, management has concluded that Dell's internal control over financial reporting was effective as of [relevant date].

\*     \*     \*

*Changes in Internal Control Over Financial Reporting* – Dell's management, with the participation of Dell's Chief Executive Officer and Chief Financial Officer, has evaluated whether any change in Dell's internal control over financial reporting occurred during the fourth quarter of fiscal [date]. Based on that evaluation, management concluded that there has been no change in Dell's internal control over financial reporting during the fourth quarter of fiscal [date] that has materially affected, or is reasonably likely to materially affect, Dell's internal control over financial reporting.

271.   The certifications were filed with the following 10-Q and 10-K Reports on or about the date stated, signed by the defendant indicated:

| PERIODIC REPORT | M. DELL | ROLLINS | SCHNEIDER |
|---|---|---|---|
| 2003 10K | 4/25/03 | | 4/25/03 |
| 1Q 04 | 6/16/03 | | 6/16/03 |
| 2Q 04 | 9/15/03 | | 9/15/03 |
| 3Q 04 | 12/15/03 | | 12/15/03 |
| 2004 10K | 4/12/04 | | 4/12/04 |
| 1Q 05 | 6/9/04 | | 6/9/04 |
| 2Q 05 | | 9/7/04 | 9/7/04 |
| 3Q 05 | | 12/1/04 | 12/1/04 |

| | | | |
|---|---|---|---|
| 2005 10K | | 3/7/05 | 3/7/05 |
| 1Q 06 | | 6/3/05 | 6/3/05 |
| 2Q 06 | | 9/1/05 | 9/1/05 |
| 3Q 06 | | 11/28/05 | 11/28/05 |
| 2006 10K | | 3/15/06 | 3/15/06 |
| 1Q 07 | | 6/7/06 | 6/7/06 |

272.    Each of the Sarbanes-Oxley certifications filed in Dell's quarterly and annual SEC reports was false and misleading. Dell's financial controls were not adequate to assure compliance with SEC reporting regulations, principles of fair reporting or GAAP. Specifically, the controls were inadequate to assure proper recognition of revenue, proper recognition and accrual of warranty costs and product repair costs and proper presentation of the true nature and impact of the secret Intel rebates/kickbacks which were so material to Dell's quarterly operating profits and operating profit margins. In addition, Dell's internal disclosure controls were inadequate because they were not preventing Dell from making false and misleading statements about its business and finances as detailed in this Complaint, including failure to disclose the highly material Intel rebates/kickbacks upon which Dell's superior financial performance actually depended and without which Dell's future financial performance would be much worse than that being forecast. Finally, the Sarbanes-Oxley certifications were false and misleading because material fraud existed within Dell vis-à-vis its SEC filings and public disclosures, including an override by its top executives, *i.e.*, M. Dell, Rollins and Schneider, of the systems that were, in fact, in place at Dell regarding compliance with SEC rules, regulations and GAAP accounting.

273.    These 10-K and 10-Q certifications were material to investors. After the upsurge of fraud in public companies in 2000-2002, Congressional investigations showed that in most cases these financial frauds occurred, in part, because of weak internal or disclosure controls and inevitably involved the CEO and CFO of the company. The Sarbanes-Oxley procedures and the certifications representing that those procedures had been followed and were effective are meant

- 214 -

to provide significant assurance to investors that the issuer and executives involved are acting honestly and not engaged in making false statements, inadequate disclosures or financial falsifications. Investors rely on these representations and they are reflected in the price of the issuer's stock.

## PRICEWATERHOUSECOOPERS' LIABILITY

274.   PWC's Austin office was engaged to examine and report on Dell's financial statements for F03-F06, to perform review services on Dell's interim F03-F06 results, and to provide consulting, tax and other services related to Dell's SEC filings, including comfort letters, consents and comment letters. PWC, or its predecessor, has been Dell's auditor since 1986. PWC further audited Dell's internal controls over financial reporting for F05 and F06 and issued reports on those audits. PWC's unqualified reports on Dell's financial statements and internal controls were included in Dell's SEC filings. As a result of the far-reaching scope of services provided by PWC and its long-term engagement by Dell, PWC personnel were intimately familiar with Dell's business, including Dell's accounting for its rebates from Intel and its reserves for warranty liabilities.

275.   PWC participated in the wrongdoing alleged herein in order to retain Dell as a client and to protect the fees it expected to receive from Dell. PWC enjoyed a lucrative business relationship with Dell's senior management for which it has received millions of dollars in fees for auditing, internal control work, consulting and tax services. PWC's work for Dell included special engagements such as verifying the number of employees in certain municipalities so Dell could receive subsidies per employee in those municipalities. PWC received $11.3 million and $10.9 million in fees from Dell in F06 and F05, respectively. These fees were particularly important to the partners in PWC's Austin office, as their incomes were dependent on the continued business from Dell.

**PWC's False Statements as to
Dell's Financial Statements**

276.    PWC falsely represented that Dell's financial statements for F03 were presented in accordance with GAAP and that for F03-F04 PWC's audits of Dell's financial statements had been performed in accordance with GAAS.  For F05-F06, PWC represented it had completed an integrated audit of Dell's financial statements and internal controls  in accordance with standards of the Public Company Accounting Oversight Board ("PCAOB").  PWC also consented to the incorporation of its false reports on Dell's financial statements in Dell's Form 10-Ks for the respective years of its audits, which were filed with the SEC.  PWC's issuance of materially false reports on Dell's F03-F06 financial statements was by itself a violation of GAAS and the PCAOB.

277.    The SEC has stressed the importance of meaningful audits being performed by independent accountants:

> [T]he capital formation process depends in large part on the confidence of investors in financial reporting.  An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest.  The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. ***Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised.***

*Relationships Between Registrants and Independent Accountants*, SEC Accounting Series Release No. 2961, 1981 SEC LEXIS 858, at *8-*9 (Aug. 20, 1981).

278.    GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relate to the conduct of individual audit engagements.  Statements on Auditing Standards (codified and referred to as AU §__) are recognized by the AICPA as the interpretation of GAAS.  Subject to SEC oversight, §103 of the Sarbanes-Oxley Act authorizes the PCAOB to establish auditing and related attestation, quality control, ethics, and

independence standards to be used by registered public accounting firms in the preparation and issuance of audit reports as required by the Act or the rules of the Commission. Accordingly, public accounting firms registered with the PCAOB are required to adhere to all PCAOB Standards in the audits of the financial statements of issuers, as defined by the Act, and other entities when prescribed by the rules of the Commission.

279. With respect to Dell's financial statements for the fiscal year ended 1/30/04, PWC represented, in a report dated 2/12/04 included in the Company's 2004 10-K, the following:

To the Board of Directors and Stockholders of Dell Inc.

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Dell Inc. and its subsidiaries at January 30, 2004 and January 31, 2003, and the results of their operations and their cash flows for each of the three fiscal years in the period ended January 30, 2004, in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index, presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of Dell's management; our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with auditing standards generally accepted in the United States of America, which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

As discussed in Note 1 to the consolidated financial statements, during fiscal 2004 Dell changed its method of accounting to consolidate the results of Dell Financial Services L.P., an existing joint venture.

PRICEWATERHOUSECOOPERS LLP

280. PWC issued a nearly identical report as to Dell's F03 financial statements.

281.    With respect to Dell's F05 financial statements, PWC represented in a report dated 3/3/05, the following:

## REPORT OF INDEPENDENT REGISTERED
## PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders of Dell Inc.

We have completed an integrated audit of Dell Inc.'s January 28, 2005 consolidated financial statements and of its internal control over financial reporting as of January 28, 2005 and audits of its January 30, 2004 and January 31, 2003 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

**Consolidated Financial Statements and Financial Statement Schedule**

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of Dell Inc. and its subsidiaries at January 28, 2005 and January 30, 2004, and the results of their operations and their cash flows for each of the three years in the period ended January 28, 2005 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedule listed in the accompanying index presents fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. These financial statements and financial statement schedule are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedule based on our audits. We conducted our audits of these statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit of financial statements includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

**Internal Control Over Financial Reporting**

Also, in our opinion, management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A – Controls and Procedures, that the company maintained effective internal control over financial reporting as of January 28, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), is fairly stated, in all material respects, based on those criteria. Furthermore, in our

- 218 -

opinion, the company maintained, in all material respects, effective internal control over financial reporting as of January 28, 2005, based on criteria established in *Internal Control – Integrated Framework* issued by the COSO. The company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the company's internal control over financial reporting based on our audit. We conducted our audit of internal control over financial reporting in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. An audit of internal control over financial reporting includes obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we consider necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PRICEWATERHOUSECOOPERS LLP

282.    PWC also signed off on and approved Dell's quarterly financial results prior to

their issuance to the public during the Class Period.  According to Dell's 2006 Proxy Statement

filed on 7/21/06, the audit fees billed by PWC in connection with F05 and F06 were for the

audits of the consolidated financial statements and audit of internal controls under §404 of

Sarbanes-Oxley.   PWC also received fees for audits of Dell's employee benefit plans and contract compliance work and timely quarterly reviews.   PWC also was paid for tax work, including tax consulting for Dell executives.

283.   PWC's reports were false and misleading due to its failure to comply with GAAS and PCAOB rules and because Dell's financial statements were not prepared in conformity with GAAP, as alleged above, so that issuing the reports was in violation of GAAS and SEC rules. PWC knew its reports would be relied upon by the Company as well as by present and potential investors in Dell's stock.

**PWC Ignored the Audit Evidence It Gathered**

284.   GAAS, as set forth in AU §326, *Evidential Matter*, requires auditors to obtain sufficient competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit:

> In evaluating evidential matter, the auditor considers whether specific audit objectives have been achieved.  The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles.   In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements.   To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

AU §326.25 (footnotes omitted).  The PCAOB adopted this same standard.

285.   PWC's responsibility, as Dell's independent auditor, was to obtain "[s]ufficient competent evidential matter . . . to afford a reasonable basis for an opinion regarding the financial statements under audit" as to "the fairness with which they present, in all material

respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." AU §§150, 110.

286.    In violation of GAAS and PCAOB rules, and contrary to the representations in its report on Dell's financial statements, PWC did not obtain sufficient, competent, evidential matter to support Dell's assertions regarding its accounting for its loss reserves.

**PWC Failed to Design Its Audit to Identify the Alleged Improprieties**

287.    As one of the largest audit firms in the world, PWC was well aware of the strategies, methods and procedures required by GAAS to conduct a proper audit.  Also, PWC knew of the audit risks inherent at Dell and in the industries in which Dell operated because of the comprehensive services it provided to Dell and its experience with many other clients in the computer industry.  PWC was also the auditor for IBM and Cisco.  In fact, on PWC's Web site, it emphasizes its expertise in providing assurance services with respect to complete and accurate financial statements:

> **Financial Statement Audit**
>
> The financial statement audit has never been more important.  In today's business environment there is more scrutiny and skepticism of a company's financial statements than ever before.  Investors have lost faith in corporate governance and reporting and they expect more:  greater reliability, more oversight and clear evidence of internal controls.  Corporate management, boards and audit committees, internal and external auditors, analysts and other investment professionals all have important roles to play in rebuilding investor trust by executing their respective responsibilities, keeping in mind both legal obligations and the heightened expectations of investors.  Meeting investor expectations begins with the completeness and accuracy of information contained in a company's financial statements.
>
> *          *          *
>
> **How . . . PwC can help you**
>
> For organisations that require an audit for statutory or regulatory reasons associated with the filing of their annual and periodic financial information, PwC can provide high quality audit services.  We can also address any specific regulatory reporting requirements such as those under Sarbanes-Oxley S404 for SEC registrants, including foreign private issuers.

- 221 -

PwC's work takes into account all current and where appropriate, prospective auditing, accounting, and reporting regulations and guidance. Our audit clients include many of the world's leading multinational corporations, as well as many small and medium-sized companies and a significant number of local authorities and other public sector bodies.

- Compliance with regulations
- Advice on controls and processing system weaknesses
- Confirmation of accounting treatments with respect to complex transactions
- Increased monitoring of prospective accounting and regulatory changes
- Independent review of externally reported information
- Accountants' reports

288.   PWC's Web site also represented PWC had special expertise in assisting companies with internal controls:

**How PwC can help you**

Our Systems and Process Assurance (SPA) practice provides services related to controls around the financial reporting process, including financial business process and IT management controls. Serving both audit and non-audit clients, SPA provides:

- Financial and operation applications/business process controls reviews
- Database security controls reviews
- IT general controls reviews
- Infrastructure security reviews
- Third party assurance and opinion services
- Sarbanes-Oxley readiness, process improvement and sustainability services
- Compliance with other regulatory requirements (e.g., Turnbull, Basel II, King)
- Due diligence on systems and controls
- Pre- and post-implementation systems reviews
- Project assurance services
- Data services (e.g., CAATs, data quality reviews)
- Computer security reviews

289.   In connection with Dell's operations, PWC had virtually limitless access to information concerning the Company's true operations as:

- PWC had been Dell's auditor since 1986.

- PWC was present at Dell's headquarters and divisions frequently during the Class Period.

- PWC provided Dell with substantial internal control services to Dell.

- PWC had frequent conversations with Dell management and employees about the Company's operations and financial statements.

- PWC audited and reviewed Dell's financial statements during the Class Period and knew or should have known that Dell's financial statements were not accurate or prepared in compliance with GAAP or GAAS or PCAOB standards.

- PWC knew that Intel was Dell's biggest supplier and that any rebates from Intel were significant to Dell's bottom line. This rebate, approximately $1 billion annually, was shown on a separate line item on Dell's internal financial statements for at least one of its divisions.

- PWC would have been included in discussions with the SEC about the SEC inquiry into Dell's accounting. PWC knew this inquiry was not disclosed to Dell's shareholders.

290. PWC's intentional failure to comply with PCAOB and GAAS in its performance on the Dell audits rose to the level of deliberate recklessness, as the following paragraphs demonstrate. PWC abandoned its role as independent auditor by turning a blind eye to each of the above indications of improper accounting, including Dell's accounting for warranty expenses. Despite this knowledge, PWC did not insist upon adjustments to Dell's audited financial statements. Pursuant to GAAS, PWC should have issued a qualified or adverse report, or it should have insisted that Dell comply with GAAP.

291. As to its audits of Dell during the Class Period, PWC was required to perform its audit in conformity with the Statement of Accounting Standard ("SAS") No. 82, *Consideration of Fraud in a Financial Statement Audit*, which includes auditing for material misstatements arising from fraud. PWC failed to comply with SAS No. 82 in its audit of Dell's financial statements. During the course of its audit of Dell's financial statements during the Class Period, PWC knew of or should have discovered the irregularities which caused Dell's earnings to be misstated. The very risk of fraud was a potential reportable condition which should have been reported to the audit committee and possibly senior management.

292.   PWC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of years, leading to false and misstated financial statements.  Moreover, PWC failed to adequately audit Dell's internal controls which were inadequate and permitted Dell's misstatements to occur.

293.   Despite PWC's "clean" audit reports during the Class Period, Dell has recorded $307 million in special charges related to its warranty liabilities.  These charges did not relate to recent events, but had been incurred in significant part much earlier in the Class Period. Moreover, the SEC had begun an inquiry into Dell's accounting and requested that the Company produce documents and information.

294.   The special charges and the SEC inquiry all involve periods during which Dell's financial results had been audited by PWC and for which PWC had issued unqualified reports.

**PWC's Audit Procedures Violated Fundamental Concepts of GAAS**

295.   PWC's failure to adequately perform its audit procedures to identify the improprieties alleged herein and its failure to report the problems permitted the accounting irregularities and improprieties to continue over a period of at least a one year, leading to false and misstated financial statements.  Due to PWC's false statements and failure to identify and modify its reports to identify Dell's false financial reporting, PWC violated the following PCAOB and GAAS standards:

(a)   The first general standard is that the audit should be performed by persons having adequate technical training and proficiency as auditors;

(b)   The second general standard is that the auditors should maintain an independence in mental attitude in all matters relating to the engagement;

(c)     The third general standard is that due professional care is to be exercised in the performance of the audit and preparation of the report;

(d)     The first standard of field work is that the audit is to be adequately planned and that assistants should be properly supervised;

(e)     The second standard of field work is that the auditor should obtain a sufficient understanding of internal controls so as to plan the audit and determine the nature, timing and extent of tests to be performed;

(f)     The third standard of field work is that sufficient, competent, evidential matter is to be obtained to afford a reasonable basis for an opinion on the financial statements under audit;

(g)     The first standard of reporting is that the report state whether the financial statements are presented in accordance with GAAP;

(h)     The second standard of reporting is that the report shall identify circumstances in which GAAP has not been consistently observed;

(i)     The third standard of reporting is that informative disclosures are regarded as reasonably adequate unless otherwise stated in the report; and

(j)     The fourth standard of reporting is that the report shall contain an expression of opinion or the reasons why an opinion cannot be expressed.

## SCIENTER AND SCHEME ALLEGATIONS

296.     During the Class Period, the defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the falsity of the statements they made or acted in reckless disregard of the truth or falsity of those statements.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Dell stock during the Class Period.

297.    The Dell Defendants' massive insider selling raises a strong inference of knowledge or fraud by each selling defendant as the selling of each was unusual in timing and amount.

298.    Dell curtailed its own manufacturing quality and control programs to save money, cutting back on inspections and testing of both component parts (including batteries) and finished goods, *i.e.*, PCs, knowingly or recklessly disregarding that this would exacerbate Dell's product quality problems.  Dell did not independently test laptop computer parts manufactured by third-party suppliers, including batteries, hard drives, optical drives (*i.e.*, CD or DVD drives) or motherboards.  Instead, Dell's suppliers conducted the testing.  Dell did not test third-party supplier (vendor) parts.  Dell allowed the Company's vendors to conduct parts testing.  The Company took the vendor's word for it where part quality was concerned.  Dell only checked the *functionality* of the particular part.  For example, when Dell purchased laptop batteries from Sony, upon receipt of the parts, Dell only placed the batteries in the laptops to make sure that they provided a power source (*i.e.*, allowed the laptop computer to turn on).  This was why Dell did not catch the defective Sony battery issues prior to shipment of the batteries to market.  CEO Rollins was very involved in the Company's product quality issues, as Rollins handled operational functions at the Company.

299.    Producing high-quality laptops required testing of various parts, including hard drives, floppy drives, optical drives (*i.e.*, CD or DVD drives) motherboards and batteries. Between 2002 and 2006, Dell's average repeat return rates for all laptops were very "high" – between 12% and 15%.  A "good" return rate for a technology company was between four and five percent and a 12% to 15% return rate was "bad."  The power adaptor used for a very large number of laptops had a 30% repeat return rate in 2004 and 2005.  A power adaptor plugs into the back of notebooks and is used to recharge the notebook's battery.  The particular adaptor

used in 2004 and 2005 supplied 19 volts to the notebook.  Defective laptop products were on most occasions returned directly to the suppliers.  Dell suppliers conducted testing on the returned laptops and then provided the Company with repeat return rate data ("Supplier Data").  The Supplier Data included information regarding the number of returned notebooks tested, the failure rates of same (*i.e.*, information regarding customer-induced failures and failure of replaceable (or "accessory") parts, such as power adaptors, hard drives and motherboards).  Upon receipt of the return rates, Dell then attempted to determine the specific reasons why customers were returning their notebooks multiple times, based on the Supplier Data.

300.    Dell was encountering lithium battery problems due to supplier shortfalls and its own manufacturing problems as early as 2001.

301.    Notebook batteries were not independently tested by Dell prior to shipment.  If a Dell OEM (original equipment manufacturer) stated that a particular battery was compatible with the specifications of the notebook it would be placed in, then Dell accepted this.  Dell should have been able to determine that the Sony batteries would explode if it had conducted the proper battery compatibility testing.  The only laptop battery "testing" that Dell did was either checking to determine if batteries charged properly (and sometimes the Company did not even do this) or placing the battery in the laptop to determine if it provided a power source (*i.e.*, that the laptop would turn on).  Testing Department engineers hooked up laptop batteries to a machine to determine if the batteries would charge from an eight to a nine on the "battery scale meter."  This was not a good test capability for batteries.

302.    In order to determine if the batteries within a particular lot (certain number of batteries) were compatible with the notebook products in which they were to be placed, full testing had to be done on the batteries.  Full testing required testing of the battery's current (or wattage) and load capabilities (or rates) to make sure that such rates matched the notebook's

required rates in these areas. Special tools are required to do this testing and Dell did not have these tools (and did not required its suppliers to conduct this testing). A battery's load must be tested to make sure that the battery can perform to the maximum current for which it is designed. If this testing is not conducted, the batteries are likely to blow up because notebooks are specifically designed to accept only certain wattage batteries. Deviating from this specification results in over-heating, leading to explosion.

303.   Dell did not conduct load or current testing on batteries. Only 30 or 40 minutes were allotted for pre-shipment laptop testing, per laptop unit, at Dell and this was not enough time to conduct battery testing, "burn in" the units or any other extensive testing. The Company did not test batteries in order to cut costs. Full testing is very time consuming. Dell relied on the fact that if a problem developed, the customer could return the laptop to a supplier and get a replacement part.

304.   The Sony laptop battery issue (*i.e.*, the fact that these batteries were exploding/catching on fire) surfaced in late 2005 and information about this issue was included in customer service call center monthly reports based on customer complaints. There was also notice of the problems via an official corporate e-mail that came from a senior executive at Dell.

305.   Dell shipped finished computer products without conducting product testing for accessory parts in order to rush products to market. It was the Test Engineering Department's responsibility to then catch the problems later, after Dell satisfied its financial numbers by shipping a certain number of products within a particular time period, *i.e.*, yearly or quarterly. There was technology available to test certain products that Dell did not utilize and the failure to use such testing benefited the Company by cutting costs and increasing the number of items shipped. Dell relied on the fact that if there was a problem with accessory parts placed in laptops, it was up to the customer to return the product to one of its suppliers and then obtain a

free replacement part (*i.e.*, a new battery or power adaptor to replace a defective battery or power adaptor). The products would eventually be shipped back to Dell suppliers and would require additional testing at that time to determine the specific cause of repeat return rates.

306. With respect to parts purchased by the buyers in the Custom Factory Integration Group ("CFI"), quality engineers tested parts that went into the processor like a sound card, NIC card (network card) or video graphic card as opposed to items attached to a system like speakers or a keyboard. CFI did not test all the products purchased by buyers in the CFI Group. For example, Dell purchased certain keyboards at the request of DaimlerChrysler. DaimlerChrysler requested approximately 1,000 special keyboards. After the keyboards were sent out into the field (delivered to the customer), the failure rate was high, over 50% to 80%. DaimlerChrysler soon complained to Dell about the quality of the keyboards. Dell sought to return them to the keyboard manufacturer, but the manufacturer refused to take them. The supplier argued that Dell had "qualified" the keyboards by adding them to its systems and sending them out to the customer (*i.e.*, Dell approved the keyboards for use by shipping them to the customer). These keyboards were not tested and thus the failure rate in the field was very high.

307. Dell's third-party suppliers conducted parts testing for the computer server component products that the particular supplier sold to Dell, prior to the assembly of those products at Dell. Dell conducted only system-level server tests. This meant that a certain small percentage of Dell servers were "pulled off the production assembly line" and that tests were conducted on the systems used with the server to determine if they functioned. Suppliers provided the external parts for servers, such as disc drives, processors and memory, and then Dell assembled the servers at its assembly or manufacturing plant in Austin, Texas. In the process of assembling the servers, Dell integrated (or hooked up) the external parts to the server,

turned on these parts and tested them prior to shipment. This process was referred to at Dell as system regression testing.

308.    The Company had a lot of problems with server power supply parts purchased from its suppliers, but the worst power supply part failure occurred in 9/04 or 10/04. A power supply is the part in a server which connects to a power cord, that plugs into a power source in a wall, and converts AC (or alternating current power) to DC power. Astec (a power supply manufacturer) supplied power parts purchased by Dell in mid-2004 which were plagued with "serious endemic failure." There was a massive contamination that occurred during the printed circuit board assembly ("PCA") process. Printed circuit boards were located inside the power supply part. Proper PCA required a two-step washing process which occurred during the initial creation of the boards. First the printed circuit boards must be dipped into acid. Next, the circuit boards must be dipped into distilled water. Astec failed to maintain proper quality control in their PCA process and dipped the circuit boards into tap water instead of distilled water. Dell recalled or ordered a stop-ship of server products with Astec power supply parts (also referred to as a recall of the servers with faulty parts) after servers with faulty power supply parts had been shipped to Dell customers for several months before the problem was discovered. Dell had discovered the power supply part failure problem during its system regression testing process, before customers began to complain about the problem. Yet, the server products were shipped with faulty Astec power supplies for several months.

309.    Server group employees presented information to the meeting attendees regarding quality control metrics for Dell's server products, which included information regarding product IFIRs (initial failure incidents rates, which were measured from first shipment to 30 days) and FIRs (failure incident rates, which were measured from 31 days on). Dell's quality control metrics also included information regarding customer shipment dates (measured by order date).

Dell monitored server product failures/problems by server part (*i.e.*, hard disc drive failures and processor failures) and by final server (*i.e.*, assembled or completed servers). There were also presentations made at the meetings about the status of every Dell server product.

310.   The Intel/Dell rebate/kickback scheme was negotiated and agreed to at the top levels of the two companies and, because of the size of the quarterly rebates and their tremendous importance to Dell in materially reducing operating expenses as a percentage of revenues and increased operating profit margins, were known to all top Dell executives, including the Dell Defendants.

311.   Intel and Dell had an exclusive relationship and Dell received product rebates for shipping only Intel-based products and not doing business with AMD, called e-CAP payments. The definition of "e-CAP" is "exception to corporate average pricing." e-CAPs at Dell typically referred to the discounts that Intel gave on its microprocessor chips. Dell received the rebate money from Intel at the end of each quarter. Dell accrued for the total amount of the rebate at the end of the quarter, whether or not the Company physically received the money or not. By 2002, these e-CAP payments increased greatly as the Company's sales increased dramatically (including sales of Intel-based products) from 1996 until 2006. Dell received over $100 million per quarter in such payments during the Class Period.

312.   Intel's Marketing Development Funds ("MDFs") were different than the rebates described above. Dell also received MDFs from Intel on a quarterly basis and was required to spend these funds on the sales and marketing of Intel-based products. In contrast, the rebate funds could be used in any way the Company chose. MDFs were required to be used for sales or marketing purposes by the Company. The amount of MDFs paid to Dell were dependent on the percentage of revenues earned by the supplier from Dell's sales of the supplier's products (*i.e.*, Intel-based products).