313.    Dell received a lump sum of money at the end of every quarter for not shipping AMD-based products.  This was a separate "bucket" of money that Dell received, *i.e.*, separate from rebates.  This was based on a side understanding.  The amount of funds provided to Dell for not shipping AMD-based products was paid on a quarterly basis.  Senor executives at Dell often spoke in great detail about the importance of receiving the funds from Dell for not shipping AMD-based products during the weekly Server Group staff meetings.  On a regular basis (at least yearly), Dell developed AMD-based products and came "very close" to shipping these products, *i.e.*, the products were set to ship within a few months or possibly weeks; however, Dell always decided not to ship the AMD products, due to the large sums of money the Company would lose from Intel for breaching the exclusive Dell/Intel processor relationship.

314.    The Company received approximately $1 billion a year in Intel e-CAP rebates.  The approximately $1 billion a year in rebates that Dell received was spread out unevenly over the four quarters.  There was no quarter where Dell did not receive the payments during the Class Period.

315.    The e-CAP rebates were used to lower Dell's cost of goods sold.  For example, if Dell's cost of goods sold was $437.5 billion and the microprocessor chips cost 25% of that amount (approximate $9.4 billion) and Dell received 10% back in rebates, then Dell lowered its cost of goods sold by approximately $1 billion.  MDFs that it received from Intel were separate from the Intel rebates.  MDFs related to Dell's advertising, such as Dell including the slogan "Intel Inside."  Intel paid 50% of the costs of this advertising.  Dell received approximately $50-$100 million a year in MDFs.  Unlike the Intel rebates, Dell accounted for MDFs as an SG&A expense.

316.    Dell did not receive e-CAPs from any supplier except Intel, including Microsoft.  Dell and Intel had an exclusive relationship from the inception of Dell until approximately 9/06,

when Dell began shipping a Dell desktop computer with AMD's Athlon 64 and Sempron processors.  Despite the exclusive relationship with Intel, beginning in 1999, each year Dell designed products (desktop computers, laptop computers or servers) with AMD processors, but these products were never shipped.  Each and every time the AMD-based products were to be shipped to customers, Dell management and senior executives placed a hold on the shipment of these products due to negotiations between Dell and Intel and the exclusive supplier relationship between the two companies.  These AMD-based products were placed on hold at varying stages of development, such as design or manufacturing.  Dell engineers questioned Dell senior management regarding why the superior quality AMD processors were not being used in Dell's products.  The Company's management was questioned by engineers during the Server Group Town Hall meetings (held on a quarterly basis).

317.   There were meetings to discuss how much Dell would receive in e-CAP dollars, how these rebates would be spread out and how Dell would account for them.  These meetings typically took place behind "closed doors" at the top executive level.  Only about 15 people were involved in handling the Intel rebates, including M. Dell and Rollins.  Intel's co-founder, former Chairman and CEO, Andy Grove, was also involved.  One reason these meetings were so exclusive was because there were questions about how the rebates affected fair trade.

318.   Dell divided up the money or credits it received from Intel among different divisions.  Dell management discussed the Intel credits at forecasting meetings.  They were told that they came in at M. Dell's and Rollins' level and were dispersed throughout the Company.  That is, the credits were included on the various division P&L statements.  The Finance Leads for each division were responsible for putting the credits into the P&L statement for the sector.  The Intel credits likely came into Dell through CFO Schneider's office.  Schneider had his staff

distribute them among the Finance Leads and Senior Vice Presidents of each major operating division.

319. Certain sectors of Dell's operations began to look to them to help it make the quarter. At one forecasting meeting, the Public Sector was worried about missing the quarter and someone specifically asked about Intel credits because they were trying to think of anything that could help the quarter. They were told by the Finance Director that Dell would not be receiving them. This meeting took place around the time AMD was suing Intel in the U.S. There were a number of different statements inside the Company as to why Dell would not receive the Intel credits that quarter. One was that it had to do with microprocessor competitor AMD suing Intel in the U.S.

320. Dell had a complex and complicated system of compiling statistical profiles of customer behavior and attitudes and Dell's sales and expenses on a daily or weekly basis. Rollins or Schneider admitted:

- "[O]ne of the beauties of the model is that we can see very early on in a quarter what's happening to volumes, what's happening to overall cost position and margins . . . ."

- "I want to briefly discuss three topics related to Dell's business model . . . . First, the timely information flow provided by the Dell business model . . . the direct model provides Dell with information flow advantages that are . . . important. *These advantages . . . yield visibility and agility that enables us to precisely adjust to the prevailing market environment faster than anyone else. . . . And on the consumer side, Dell's knowledge of prospect demands and preference is unparalleled. We track the ROI of price movements and promotions on a realtime basis, and are able to react to substantial shifts in response to profitability in a matter of hours, even minutes. . . . Dell's direct relationship with customers on the front end . . . enable[s] us to excel in any environment* . . . ."

- "The direct-to-customer model also provides Dell with a constant flow of information about trends in customers' plans and requirements."

- "Our direct model gives us an unparalleled view in the customer demand which enables us to set robust targets designed to yield balanced, profitable growth. . . . We also manage the direct relationship with our customers across all segments

and region. *This provides us with a highly valuable flow of information that is a key competitive advantage for Dell.*"

- "*We regularly measure our performance from the customer's perspective. As examples, we track how easy it is to contact Dell, the accuracy with which orders are fulfilled, if deliveries are on time, overall product quality, whether we correct an issue the first time, and if our customers are treated with courtesy and respect.*"

- "*Dell's direct model provides direct and continuous feedback from its customers*, thereby allowing the company to develop and refine its products and marketing programs for specific customer segments. *This constant flow of communication, which is unique to the direct model, also allows Dell to rapidly gauge customer satisfaction and target new or existing products.*"

321. On 9/10/04, Bernstein Research issued a report "initiating coverage" on Dell which was based on information provided by Dell describing how Dell's internal information systems operated:

Dell's direct model enables it to *tightly manage its business to respond quickly to market conditions and deliver highly consistent results.* An appropriate analogy is to imagine Dell's management team running the business in a control room of gauges and dials. *The gauges provide daily information on things such as sales volumes, production capacity utilization, component prices and ASPs by product and market. The dials control things such as price, sales incentives, production capacity and inventory. Based on the information on the gauges provided by Dell's "intimate" business model, the company's management team is able to constantly tune the business, adjusting the marketing mix based on sales and component costs by increasing/decreasing prices on product A in market B, adding a free memory upgrade in another market based on recently acquired low cost components or a competitive offer, and adjusting sales force incentives in a third market to drive additional volume.*

\*     \*     \*

*Dell's feedback loops also enable it to collect data that allows it to measure and manage everything about a sale, including its pricing/promotion effectiveness and its long term profitability.* For each PC assembled and sold, Dell can track a [sic] enormous range of data, including: who sold it, for what price, the serial numbers of the components used, how long it took to assemble and deliver, *how many support calls were received and on which issues, etc.* Dell's management can use these data to measure the long term profitability of product lines and customers *and flag issues such as a product or component that frequently causes costly support center calls.* This enables Dell to more accurately judge the profitability of products, segments and markets and set prices accordingly, and is a key enabler of its systematic (but profitable) share gains.

322.   Because of the way they closely and constantly monitored the Dell sales and service and support customer interactions, the Dell Defendants knew of the serious and growing problems with Dell's product quality and service and support.

323.   Weekly Consumer Group sales meetings also discussed the sales in the Consumer Group and looked at sales trends based on information in the Company's sales database. CFO Schneider and CEO Rollins were provided with the weekly sales reports for the Consumer Group, as well as those for the other product groups at Dell.  Certain Consumer Group employees retrieved sales information from the Company's sales database, mentioned above, and provided this information in a report to Rollins and Schneider "at the very least weekly." The individual who provided the reports to Rollins and Schneider mentioned this on a regular basis at the weekly Consumer Group meetings.  Rollins and Schneider also received Consumer Group sales reports on a daily basis in "crunch times," such as at the end of every quarter.  Rollins and Schneider were "intensely numbers-oriented" (for sales, customer service, etc.).

324.   At the Consumer Group weekly meetings, the group discussed sales call center monitoring (to determine the wait times for handling customer calls, etc.).  Dell customers complained about the inadequate customer service they received.  Customers were mainly dissatisfied with the length of time they were required to wait on the phone prior to speaking with a customer service call center technician and the fact that their issue was not resolved during the first call, if at all, due to the lack of knowledge about the computer issue at hand by Dell technicians.  Customers also complained about the fact that they were transferred around too much from Dell employee to Dell employee in an attempt to fix their computer issue. Customers complained about not being informed when their order was to be significantly delayed in shipment.

325.   Dell executives received customer service information in a general report format from Dell's internal Customer Service Department on a monthly basis.  This information related to the Consumer Group, as well as other product complaints (*i.e.*, products sold to small businesses and large businesses).  The report came in an e-mail from an automated customer service e-mail account (*i.e.*, one where no e-mail replies are permitted/handled).  The Customer Service Department tracked customer complaints.  That information was tracked based on Dell's call center metrics, which included information about wait times, length of call, resolution of technical issue and customer complaints about customer/product services.

326.   Rollins and Schneider received Customer Service Call Center reports on at least a quarterly basis and probably more often, in e-mail form directly from the Customer Service Call Center.   Sales employees were contacted by Rollins and Schneider directly about customer service trends via e-mail.  It was common knowledge that Rollins and Schneider were "on top of" customer service complaints/issues because they pressured employees to stay focused on these issues via various e-mail communications sent out to employees who were in contact with customers, such as the Sales Department personnel.

327.   Dell senior executives, including Rollins and Schneider, received the University of Michigan ("UofM") study/survey that came out in 8/05 which showed that Dell customer satisfaction ratings were at their lowest since 1998.  This study was distributed to a large number of Company employees shortly after (a day or so) it came out.  Top level employees received e-mail communications from Rollins and Schneider in 8/05 about the UofM study.   In these communications, Rollins and Schneider stated that Dell needed to improve its customer satisfaction ratings.  They received these e-mails a day or so after receiving the UofM study.  The UofM study was discussed at length in the weekly Consumer Sales Group meetings and at other times.  Rollins and Schneider were "monumentally" concerned about the UofM study and

stayed on top of the issues and communicated to Company employees about the importance of "the Dell customer experience," as they referred to it. They communicated their concerns continually via e-mail communications and through Customer Service/Sales Group directives, which were also discussed at the weekly Consumer Group meetings.

328.   After the UofM study, the Company, at Rollins' and Schneider's direction, implemented new and additional training for Dell customer service representatives in order to attempt to increase the Company's customer satisfaction levels. Part of this new training included upgrading the technical tools customer service representatives used to help customers with computer issues, such as new software, which allowed Dell representatives to view the customer's computer screen remotely while the customer was on the telephone with the representative. Representatives were also trained to focus on fixing the customer's problems the first time they called in, rather than the second or third time they called. They were given additional technical training to accomplish this task.

### THE DELL DEFENDANTS' ILLEGAL INSIDER TRADING

329.   During the Class Period, the defendants had both the motive and opportunity to commit fraud. Several of Dell's top insiders named as defendants herein and identified below (the "Insider Selling Defendants") took advantage of their knowledge of the material non-public negative information concerning Dell's business, financials and future prospects by selling 98,859,318 shares of their Dell stock for $3,322,454,411 in illegal insider trading proceeds. These sales are set forth below:[3]

---

[3]   Multiple one-day sales are aggregated and an average sales price per share used. An asterisk indicates a "contemporaneous" insider sale with a purchase by one of the named plantiffs.

| Insider | Date | Shares Sold | Price | Proceeds | % Sold |
|---|---|---|---|---|---|
| William J. Amelio | 3/13/2003 | 69,091 | $26.33 | $1,819,434 | |
| | 3/15/2004 | 13,000 | $32.92 | $427,960 | |
| | 3/31/2004 | 72,190 | $33.70 | $2,432,803 | |
| | 12/6/2004 | 325,000 | $41.47 | $13,477,750 | |
| | 5/20/2005 | 285,000 | $39.92 | $11,377,200* | |
| | 6/1/2005 | 260,000 | $40.51 | $10,532,600 | |
| | | 1,024,281 | | $40,067,747 | 93.0% |
| | | | | | |
| Donald J. Carty | 7/7/2004 | 174,000 | $35.11 | $6,109,140 | |
| | 8/17/2004 | 210,000 | $34.59 | $7,263,900 | |
| | 7/6/2005 | 60,000 | $39.84 | $2,390,400 | |
| | 8/22/2005 | 120,150 | $36.33 | $4,365,050 | |
| | | 564,150 | | $20,128,490 | 72.8% |
| | | | | | |
| Jeffrey W. Clarke | 3/5/2003 | 91,500 | $26.36 | $2,411,940* | |
| | 8/28/2003 | 144,712 | $32.27 | $4,669,856 | |
| | 11/24/2003 | 71,937 | $35.22 | $2,533,634 | |
| | 11/25/2003 | 76,500 | $35.11 | $2,685,860 | |
| | 12/1/2003 | 81,500 | $35.02 | $2,853,880 | |
| | 5/25/2004 | 11,801 | $35.16 | $414,923* | |
| | 11/16/2004 | 220,000 | $40.13 | $8,829,000 | |
| | 3/7/2005 | 195,865 | $40.74 | $7,979,531 | |
| | 6/20/2005 | 70,000 | $40.41 | $2,828,700 | |
| | | 963,815 | | $35,207,325 | 97.4% |
| | | | | | |
| Robert W. Davis | 9/9/2003 | 30,000 | $33.29 | $998,700 | |
| | 11/24/2003 | 28,960 | $35.27 | $1,021,419 | |
| | 9/20/2004 | 80,465 | $35.73 | $2,875,014 | |
| | 11/17/2004 | 32,923 | $40.58 | $1,336,015 | |
| | 12/20/2004 | 24,208 | $41.98 | $1,016,252 | |
| | | 196,556 | | $7,247,401 | 96.1% |
| | | | | | |
| Michael S. Dell | 3/13/2003 | 3,000,000 | $26.89 | $80,670,000 | |
| | 3/14/2003 | 7,000,000 | $26.53 | $185,710,000 | |
| | 3/21/2003 | 2,000,000 | $28.36 | $56,720,000 | |
| | 5/22/2003 | 2,000,000 | $30.01 | $60,020,000 | |
| | 5/23/2003 | 5,000,000 | $29.56 | $147,800,000 | |
| | 5/27/2003 | 3,000,000 | $29.65 | $88,950,000* | |
| | 5/30/2003 | 1,000,000 | $31.31 | $31,310,000* | |
| | 8/19/2003 | 2,830,000 | $33.03 | $93,474,900 | |
| | 8/20/2003 | 3,320,000 | $32.53 | $107,999,600 | |
| | 8/21/2003 | 3,850,000 | $32.39 | $124,701,500 | |
| | 8/22/2003 | 1,000,000 | $33.25 | $33,250,000 | |
| | 12/12/2003 | 4,000,000 | $33.81 | $135,240,000 | |
| | 12/15/2003 | 3,000,000 | $33.55 | $100,640,000 | |
| | 12/16/2003 | 4,000,000 | $32.71 | $130,840,000 | |
| | 12/17/2003 | 500,000 | $33.15 | $16,575,000 | |
| | 12/18/2003 | 5,580,000 | $33.42 | $186,483,600 | |
| | 12/19/2003 | 2,058,000 | $33.57 | $69,087,060 | |
| | 6/15/2004 | 1,800,000 | $35.80 | $64,440,000 | |

| | | | | |
|---|---|---|---|---|
| | 6/16/2004 | 3,075,000 | $35.44 | $108,978,000 |
| | 6/17/2004 | 2,325,000 | $34.89 | $81,119,250 |
| | 6/18/2004 | 310,000 | $35.00 | $10,850,000 |
| | 6/21/2004 | 1,290,000 | $34.89 | $45,008,100 |
| | 6/22/2004 | 1,200,000 | $34.59 | $41,508,000 |
| | 8/18/2004 | 3,575,000 | $35.19 | $125,804,250 |
| | 8/19/2004 | 5,095,000 | $34.85 | $177,560,750 |
| | 8/20/2004 | 1,330,000 | $34.71 | $46,164,300 |
| | 8/23/2004 | 1,000,000 | $34.90 | $34,900,000 |
| | 11/17/2004 | 6,725,000 | $40.42 | $271,824,500 |
| | 11/18/2004 | 4,275,000 | $40.28 | $172,184,650* |
| | | 85,138,000 | | $2,829,813,460 | 26.6% |
| | | | | |
| Martin J. Garvin | 3/7/2005 | 10,000 | $40.63 | $406,330 |
| | 6/20/2005 | 80,500 | $40.50 | $3,260,350 |
| | | 90,500 | | $3,666,680 | 100.0% |
| | | | | |
| Thomas B. Green | 6/19/2003 | 384,000 | $32.43 | $12,453,120 | 69.7% |
| | | | | |
| John S. Hamlin | 2/28/2003 | 2,065 | $27.00 | $55,755 |
| | 3/17/2003 | 20,000 | $27.75 | $555,000 |
| | 4/2/2003 | 10,000 | $28.26 | $282,600* |
| | 6/3/2003 | 20,000 | $31.00 | $620,000* |
| | 6/4/2003 | 20,000 | $31.80 | $636,000* |
| | 6/18/2003 | 110,000 | $31.88 | $3,506,800 |
| | 9/5/2003 | 44,676 | $34.32 | $1,533,157 |
| | 9/17/2003 | 30,000 | $34.44 | $1,033,200* |
| | 2/19/2004 | 20,000 | $34.34 | $686,780 |
| | 3/9/2004 | 2,690 | $31.46 | $84,627 |
| | 4/7/2004 | 10,000 | $34.71 | $347,100* |
| | 5/18/2004 | 20,000 | $34.55 | $691,000* |
| | 6/2/2004 | 10,000 | $35.54 | $355,420 |
| | 6/18/2004 | 10,000 | $34.76 | $347,600 |
| | 6/21/2004 | 50,000 | $35.13 | $1,756,571 |
| | 6/23/2004 | 50,000 | $35.25 | $1,762,500 |
| | 9/9/2004 | 70,000 | $35.50 | $2,485,000 |
| | 11/16/2004 | 46,352 | $40.03 | $1,855,584 |
| | 2/15/2005 | 30,000 | $39.90 | $1,197,021 |
| | 3/7/2005 | 80,000 | $40.71 | $3,256,510 |
| | 6/6/2005 | 30,000 | $40.82 | $1,224,600 |
| | 6/20/2005 | 103,660 | $40.49 | $4,197,410 |
| | 7/6/2005 | 9,000 | $39.56 | $356,035 |
| | 9/7/2005 | 71,000 | $35.36 | $2,510,560* |
| | | 869,443 | | $31,336,831 | 98.9% |
| | | | | |
| Joseph A. Marengi | 6/6/2003 | 280,000 | $32.17 | $9,007,600* |
| | 6/17/2003 | 74,608 | $32.36 | $2,414,315 |
| | 6/18/2003 | 200,000 | $32.01 | $6,402,000 |
| | 7/1/2003 | 12,100 | $31.69 | $383,449* |
| | 8/19/2003 | 33,660 | $33.65 | $1,132,659 |
| | 9/4/2003 | 17,304 | $34.35 | $594,392 |
| | 9/5/2003 | 40,000 | $34.20 | $1,368,000 |

|  | | | | | |
|---|---|---|---|---|---|
|  | 9/8/2003 | 40,000 | $34.07 | $1,362,800 | |
|  | 6/15/2004 | 90,548 | $36.00 | $3,259,910 | |
|  | 7/2/2004 | 12,075 | $35.45 | $428,059* | |
|  | 9/10/2004 | 236,756 | $36.01 | $8,525,584 | |
|  | 11/16/2004 | 163,248 | $40.06 | $6,538,980 | |
|  | 12/1/2004 | 33,365 | $41.01 | $1,368,299 | |
|  | 4/5/2005 | 70,000 | $39.00 | $2,730,000* | |
|  | 5/19/2005 | 40,000 | $39.53 | $1,581,200* | |
|  | 6/20/2005 | 200,000 | $40.50 | $8,100,000 | |
|  | | 1,543,664 | | $55,197,246 | 100.0% |
| John K. Medica | 6/16/2003 | 157,232 | $32.01 | $5,032,996 | |
|  | 6/18/2003 | 70,000 | $32.02 | $2,241,400 | |
|  | 9/22/2003 | 40,000 | $34.29 | $1,371,600* | |
|  | 12/6/2004 | 157,724 | $41.82 | $6,596,018 | |
|  | 12/7/2004 | 385,000 | $41.75 | $16,073,750 | |
|  | | 809,956 | | $31,315,764 | 98.8% |
| Michael A. Miles | 7/1/2003 | 300,000 | $31.30 | $9,390,000* | |
|  | 8/18/2004 | 360,000 | $35.20 | $12,672,000 | |
|  | 5/17/2005 | 384,000 | $39.20 | $15,052,800* | |
|  | 8/17/2005 | 384,000 | $36.88 | $14,161,920 | |
|  | | 1,428,000 | | $51,276,720 | 72.8% |
| Randall D. Mott | 5/24/2005 | 170,000 | $39.95 | $6,791,500* | |
|  | 5/25/2005 | 40,000 | $39.94 | $1,597,600* | |
|  | 6/10/2005 | 90,000 | $39.84 | $3,585,600 | |
|  | 6/23/2005 | 70,000 | $39.93 | $2,795,100 | |
|  | | 370,000 | | $14,769,800 | 73.7% |
| Glenn E. Neland | 3/7/2005 | 10,000 | $40.67 | $406,680 | |
|  | 3/14/2005 | 99,000 | $39.25 | $3,885,750 | |
|  | 6/20/2005 | 10,000 | $40.44 | $404,400 | |
|  | 6/28/2005 | 50,000 | $39.57 | $1,978,500 | |
|  | | 169,000 | | $6,675,330 | 98.1% |
| Rosendo G. Parra | 5/20/2003 | 280,000 | $30.35 | $8,498,000 | |
|  | 5/30/2003 | 40,000 | $31.37 | $1,254,800* | |
|  | 7/1/2003 | 200,000 | $31.23 | $6,246,000* | |
|  | 12/30/2003 | 81,216 | $34.32 | $2,787,659 | |
|  | 4/7/2004 | 120,000 | $34.73 | $4,167,600* | |
|  | 6/28/2004 | 145,354 | $35.45 | $5,152,799* | |
|  | 10/5/2004 | 200,000 | $36.10 | $7,220,000* | |
|  | 12/3/2004 | 34,051 | $41.74 | $1,421,340 | |
|  | 3/7/2005 | 158,332 | $40.70 | $6,444,756 | |
|  | 6/22/2005 | 200,000 | $40.37 | $8,074,000 | |
|  | | 1,458,953 | | $51,266,953 | 88.2% |
| Kevin B. Rollins | 2/28/2003 | 270,000 | $27.01 | $7,292,872 | |
|  | 5/28/2003 | 250,000 | $30.62 | $7,655,000* | |
|  | 8/22/2003 | 400,000 | $33.25 | $13,300,000 | |
|  | 9/18/2003 | 250,000 | $34.90 | $8,725,000* | |

| | | | | |
|---|---|---|---|---|
| | 6/8/2004 | 250,000 | $35.30 | $8,825,052 |
| | 8/17/2004 | 345,000 | $34.61 | $11,940,450 |
| | 11/16/2004 | 150,000 | $40.26 | $6,038,470 |
| | 12/9/2004 | 248,000 | $42.00 | $10,416,002 |
| | | 2,163,000 | | $74,192,846 | 99.3% |
| | | | | |
| James M. Schneider | 3/17/2003 | 100,000 | $27.73 | $2,773,064 |
| | 3/18/2003 | 100,000 | $28.04 | $2,804,427 |
| | 5/28/2003 | 250,000 | $30.86 | $7,715,000* |
| | 6/4/2003 | 50,000 | $31.75 | $1,587,500* |
| | 6/6/2003 | 50,000 | $32.16 | $1,608,000* |
| | 6/16/2003 | 50,000 | $32.00 | $1,600,000 |
| | 8/19/2003 | 296,000 | $33.38 | $9,880,480 |
| | 9/3/2003 | 100,000 | $34.35 | $3,435,000 |
| | 1/5/2004 | 140,000 | $35.00 | $4,900,009 |
| | 5/26/2004 | 70,791 | $35.40 | $2,506,004 |
| | 5/27/2004 | 12,900 | $35.51 | $458,079 |
| | 6/2/2004 | 16,309 | $35.50 | $578,970 |
| | 10/1/2004 | 50,000 | $36.05 | $1,802,500* |
| | 11/23/2004 | 140,000 | $40.40 | $5,656,000* |
| | 11/26/2004 | 75,000 | $40.91 | $3,068,250* |
| | 12/7/2004 | 17,802 | $41.86 | $745,169 |
| | 12/8/2004 | 7,198 | $41.85 | $301,247 |
| | 3/1/2005 | 20,000 | $40.45 | $809,000 |
| | 5/23/2005 | 100,000 | $40.00 | $4,000,000* |
| | 5/25/2005 | 40,000 | $40.25 | $1,610,000* |
| | | 1,686,000 | | $57,838,699 | 98.6% |

Totals:  98,859,318           $3,322,454,411

## NO SAFE HARBOR

330.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded in this complaint were not identified as "forward-looking statements" when made.    To the extent they were identified as forward-looking statements when made, specific meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements were not presented.  In Dell's conference calls, as is required, it was not stated "*that the actual results could differ materially from those projected*" in connection with any forward-looking statements made.  The Safe Harbor warnings in Dell's SEC filings and releases as well

as those made at the start of Dell conference calls were boilerplate and did not materially change during the Class Period, even though the economic and business conditions in which Dell operated and the risks facing its business did.  Alternatively, to the extent that the statutory Safe Harbor does apply to any forward-looking statements pleaded in this Complaint, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Dell who knew that those statements were false when made.

331.   Many of Dell's conference calls or presentations contained no forward-looking statement disclaimers, *e.g.,* 2/13/03, 2/25/03, 5/15/03, 8/14/03, 11/13/03, 2/12/04, 5/13/04, 8/12/04, 11/11/04, 2/10/05, 5/12/05, or disclaimers that were very limited, often referring only to the next quarter's results.

### *DURA* LOSS CAUSATION

332.   In 3/05, a series of company-specific negative revelations began regarding Dell which were inconsistent with, undercut and contradicted the Dell Defendants' prior Class Period positive representations.  First came revelations from the Japanese antitrust officials of Intel's apparently illegal practice of paying large secret end-of-quarter rebate/kickback payments to computer OEMs like Dell in return for exclusive or near-exclusive relationships – payments which boosted the OEMs' reported operating profits and margins.  Then, a customer revolt – fed by the emerging Internet blog system – began in 6/05-7/05.  It gave widespread circulation to consumer nightmares in dealing with computer purchases and computer support and service issues with Dell and received increasing publicity in the mainstream financial media, indicating that Dell's vaunted direct sales method and product quality had decreased markedly and its customer service and support operations had collapsed.  Reports of failures to honor advertised

sales terms or to provide products with promised features and refusal to honor warranties became widespread.  Defective PC motherboards (capacitors) and lithium batteries created widespread performance problems – even failures and fires – with Dell computers.  Dell's call centers – now manned by thousands of fewer personnel, more and more located in India, the Philippines or other non-U.S. locations, most of whom were ill-trained, part-time workers – disconnected customers, made them wait on hold for long times (even up to and over an hour), repeatedly transferred their calls without solving the customers' problems, refused to even address Microsoft software issues and refused to honor customer service expectations, rigidly enforcing Dell's new, restrictive consumer warranty policies which had shortened the time and breadth of coverage, implementing Dell's new "fix-on-fail-only" policy.  This resulted in an upsurge in customer outrage and dissatisfaction which hurt Dell's sales, not only with potential repeat customers, but, as adverse publicity spread, with new ones as well.

333.   In 6/05, a series of negative Dell-specific revelations began which undercut or contradicted Dell's earlier positive statements, indicating their falsity as summarized below.  As these partial revelations caused the truth to enter the market, over time in a series of revelations often accompanied by continuing false and misleading statements or false reassurances, the artificial inflation came out of Dell's stock, damaging prior Class Period purchasers of Dell's publicly traded securities.

334.   In addition, in mid-8/05, Dell began to report financial results falling short of its previously forecasted levels of performance, initially with revenue growth and operating profits/income *shortfalls* – and ultimately – operating income, operating margin and EPS *declines*!  However, rather than comply with their obligations under the federal securities laws and make truthful and complete disclosure, Dell's insiders opted instead for partial disclosures accompanied by false reassurances that sought to and did conceal the true nature and extent of

the problems Dell was encountering – the increasing defects with its products and its inability to fix its customer support and service operations, which it represented were being remedied with improving customer satisfaction. Also, Dell *continued the falsification of its financial results which had been going on throughout the Class Period, continuing to report inflated operating profit margins, operating income, net income and EPS, while understating is warranty expense*. As a result, while Dell's stock began to decline in 7/05, the stock continued to trade at artificially inflated levels until a series of company-specific negative revelations in 7/06-8/06. At that time Dell reported massive financial shortfalls due to continuing customer outrage and dissatisfaction, exacerbated by the massive spending cuts Dell had engaged in in the past few years to artificially boost its current period profitability, which was negatively impacting the revenue and profit growth, and the loss of hundreds of millions of dollars a year in secret (and possibly illegal) rebates/kickbacks Dell had been receiving from Intel to boost its reported operating profits and margins. Dell also revealed an SEC investigation into its financial reporting practices (which Dell had known about but concealed for a year), and that Dell itself had "discovered" internal financial irregularities and misreporting – all resulting in Dell's inability to file current financial statements with the SEC/Nasdaq. Dell also admitted that, as a result of these business and financial reversals, it would be required to boost corporate spending by hundreds of millions of dollars and hire almost 10,000 additional employees in an effort to restore its business so that it could more successfully compete with competitors that were selling higher quality, more attractive products, often through retailers who supplied otherwise superior customer service and support. Finally, on 9/11/06, defendants disclosed Dell would not be able to file its interim financial report for the 2ndQ F07 and that it had received a criminal subpoena from the U.S. Attorney in the Southern District of New York requesting information on Dell's financial reporting practices back to 2002. As a result of the collapse of Dell's business model

and operations, Dell's net income in F07 will be almost $1 billion less than in F06, its future growth prospects are much worse than were represented during the Class Period and its stock has fallen sharply from its Class Period highs, damaging prior Class Period purchasers.

## CLASS ACTION ALLEGATIONS

335.   This is a class action on behalf of purchasers of Dell's publicly traded securities between 2/13/03 and 9/8/06, excluding defendants (the "Class").  Excluded from the Class are officers and directors of the Company, as well as their families and the families of the defendants.  Class members are so numerous that joinder of them is impracticable.

336.   These securities include Dell's common stock and the publicly traded options to purchase Dell's common stock which were traded on the U.S. Nasdaq market.  Due to the volume of securities traded, the large amount of analyst attention to Dell, institutional trading in Dell's securities and financial coverage of Dell, these securities all traded in efficient markets throughout the Class Period.

337.   Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the prices of Dell securities and the extent of and appropriate measure of damages, as well as loss causation.

338.   Plaintiffs' claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiffs will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

339.   Proposed Class Co-Lead Counsel, William S. Lerach of Lerach Coughlin Stoia Geller Rudman & Robbins LLP and Joseph Kendall of Provost Umphrey Law Firm, LLP are highly experienced in the prosecution of securities class actions as detailed in Exs. A and B

hereto.   Their firms conducted an extensive investigation, including interviewing numerous witnesses and knowledgeable persons, and drafted this Complaint and have tried securities cases in this Court.

## FIRST CLAIM FOR RELIEF

### Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

340.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-339.

341.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did deceive the investing public, including plaintiffs and other Class members, as alleged in this Complaint and caused plaintiffs and other members of the Class to purchase Dell publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme and course of conduct, defendants, and each of them, took the actions set forth in this Complaint.

342.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's publicly traded securities in an effort to maintain artificially high market prices for Dell publicly traded securities in violation of §10(b) of the 1934 Act and Rule 10b-5.  All defendants are sued as primary participants in the wrongful and illegal conduct and fraudulent scheme and course of business charged in this Complaint.

343.   These defendants employed devices, schemes and artifices to defraud.  While in possession of material adverse non-public information, they engaged in acts, practices, and a scheme as alleged herein in an effort to assure investors of Dell's business and financial success and prospects for continued substantial growth.  This included the making of, or the participation

in the making of, untrue statements of material fact and concealing facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. This conduct artificially inflated the prices of Dell publicly traded securities and operated as a fraud and deceit upon the purchasers of Dell publicly traded securities during the Class Period, proximately causing them economic loss and damage as, through a series of disclosures beginning in 3/05, the prior misrepresentations and other fraudulent conduct of defendants became apparent, *i.e.*, the truth entered the market and the artificial inflation in Dell's stock price came out as the stock price collapsed to as low as $20.65 per share – a company-specific stock price decline not due to general stock market movements, changed economic conditions, changed investor expectations or company-specific negative events or information unrelated to the alleged misrepresentations and other fraudulent conduct.

344.   The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or acted with reckless disregard of the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

345.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Dell publicly traded securities were artificially inflated during the Class Period. Relying directly or indirectly on the false and misleading statements made by defendants or upon the integrity of the market in Dell publicly traded securities, plaintiffs and the other members of the Class purchased Dell publicly traded securities during the Class Period at artificially high prices and were damaged thereby.

346.   At the time of defendants' misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity. Had plaintiffs and the other members of the Class and the market known the truth which was not disclosed by defendants, plaintiffs and other members of the Class would not have purchased their Dell publicly traded securities, or, if they

had acquired such publicly traded securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

347.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### Violation of §20(a) of the 1934 Act
### Against Dell and the Dell Defendants

348.   Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-347.

349.   The Dell Defendants acted as controlling persons of Dell within the meaning of §20(a) of the 1934 Act as alleged in this Complaint.  By virtue of their business expertise, their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, accounting policies and methods, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Dell Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading.  The Dell Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

350.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations, and in the accounting policies and practices of the Company and, therefore, each is presumed to have had the power to control or influence the particular

transactions giving rise to the securities violations as alleged in this Complaint, and exercised the same.  The Company controlled the Dell Defendants and all of its employees.

351.    As set forth above, Dell and the Dell Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Dell and the Dell Defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

### THIRD CLAIM FOR RELIEF

#### Violation of §20A of the 1934 Act
#### Against the Insider Selling Defendants

352.    Plaintiffs repeat and reallege each and every allegation contained in ¶¶1-351.

353.    The defendants named in this Claim for Relief are the defendants that sold Dell stock during the Class Period.

354.    As shown in the attached certifications, the named plaintiffs purchased Dell stock contemporaneously with sales of Dell stock by the Insider Selling Defendants.

355.    By virtue of their positions as senior insiders of Dell, the defendants named in this Claim were in possession of material, non-public information about Dell at the time of their collective sales of more than $3.3 billion worth of their own Dell stock to plaintiffs and members of the Class at artificially inflated prices.

356.    By virtue of their participation in the scheme to defraud investors described herein, and/or their sales of stock while in possession of material, non-public information about the adverse information detailed herein, these defendants violated the 1934 Act and applicable rules and regulations thereunder.

357.    Plaintiffs and all other members of the Class who purchased shares of Dell stock contemporaneously with the sales of Dell stock by these defendants:  (i) have suffered substantial damages in that they paid artificially inflated prices for Dell stock as a result of the violations of §§10(b) and 20(a) and Rule 10b-5 herein described; and (ii) would not have purchased Dell stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements.

## PRAYER

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 to assure that the Class has an effective remedy, including freezing or otherwise restricting the disposition or transfer of the insider trading proceeds of the Individual Defendants;

D.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  January 30, 2007

PROVOST & UMPHREY LAW FIRM, LLP
JOE KENDALL
State Bar No. 11260700
WILLIE C. BRISCOE
State Bar No. 24001788


*Joe Kendall*
JOE KENDALL

3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone: 214/744-3000
214/744-3015 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
PATRICK J. COUGHLIN
DARREN J. ROBBINS
MARY K. BLASY
RAMZI ABADOU
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
G. PAUL HOWES
1111 Bagby, Suite 2100
Houston, TX  77002
Telephone:  713/571-0911
713/571-0912 (fax)

Attorneys for Plaintiffs

S:\CasesSD\Dell 06\Cpt Dell Computer.doc

ORIGINAL

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)   PLAINTIFFS

ALMAGAMATED BANK, AS TRUSTEE FOR THE LONGVIEW COLLECTIVE INVESTMENT FUND AND WOLVERHAMPTON CITY COUNCIL, ADMINISTERING AUTHORITY FOR THE WEST MIDLANDS METROPOLITAN AUTHORITIES PENSION FUND, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED

## DEFENDANTS

DELL, INC., MICHAEL S. DELL, KEVIN B. ROLLINS, JOSEPH s. MARENGI, JOHN K. MEDICA, ROSENDO G. PARRA, THOMAS B. GREEN, JAMES M. SCHNEIDER, WILLIAM J. AMERLIO, JEFFREY W. CLARKE, ROBERT W. DAVIS, JOHN S. HAMLIN, GLENN E. NELAND, RANDALL D. MOTT, MARTIN J. GARVIN, MICHAEL A. MILES, DONALD J. CARTY, INTEL CORPORATION AND PRICEWATERHOUSECOOPERS LLP

(b)  County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   **AUSTIN, TEXAS**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c)  Attorney's (Firm Name, Address, and Telephone Number)

JOE KENDALL, PROVOST UMPHREY LAW FIRM LLP, 3232 MCKINNEY AVENUE, DALLAS, TEXAS 75204 TELEPHONE 214-744-3000

Attorneys (If Known)

UNKNOWN

RECEIVED
JAN 3 1 2007
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

A07CA077 LY

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question (U.S. Government Not a Party) |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE
JANUARY 30, 2007

SIGNATURE OF ATTORNEY OF RECORD
Joe Kendall

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

ORIGINAL                     404824

AO82
(Rev. 4/90)

**RECEIPT FOR PAYMENT**
**UNITED STATES DISTRICT COURT**
**for the**
**WESTERN DISTRICT OF TEXAS**
at _Austin_

RECEIVED FROM   _Special Delivery Service DC._
_5470 L.B.J. Freeway_
_Ste. 100_
_Dallas, Texas 75240_

| Fund | | ACCOUNT | AMOUNT | |
|------|--|---------|--------|--|
| 6855XX | Deposit Funds | 086900 | 60 | 00 |
| 604700 | Registry Funds | 510000 | 190 | 00 |
| | General and Special Funds | 086400 | 100 | 00 |
| 508800 | Immigration Fees | | | |
| 085000 | Attorney Admission Fees | TOTAL | 350.00 | |
| 086900 | Filing Fees | Case Number or Other Reference | | |
| 322340 | Sale of Publications | 1:07 CV-077 | | |
| 322350 | Copy Fees | | | |
| 322360 | Miscellaneous Fees | | | |
| 143500 | Interest | | | |
| 322380 | Recoveries of Court Costs | New case | | |
| 322386 | Restitution to U.S. Government | | | |
| 121000 | Conscience Fund | Almagamated Bank | | |
| 129900 | Gifts | et al. | | |
| 504100 | Crime Victims Fund | | | |
| 613300 | Unclaimed Monies | | | |
| 510000 | Civil Filing Fee (½) | V. | | |
| 510100 | Registry Fee | Dell, Inc et al. | | |

$Checks and drafts are accepted subject to col-
lection and full credit will only be given when the
check or draft has been accepted by the financial
institution on which it was drawn.   # 101937

| DATE | 1-31-07 | Cash | Check | M.O. | Credit | DEPUTY CLERK: |
|------|---------|------|-------|------|--------|---------------|
| | 2-1 2007 | | ✓ | | | |